**The DETROIT AND TOLEDO SHORE LINE RAILROAD COMPANY,**
Plaintiff-Appellant,

v.

**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN,**
Defendant-Appellee.

No. 18059.

United States Court of Appeals
Sixth Circuit.

Oct. 7, 1968.

Certiorari Granted March 3, 1969.
See 89 S.Ct. 990.

Francis M. Shea, Washington, D. C., for appellant; Richard T. Conway, Ralph J. Moore, Jr., David W. Miller, Shea & Gardner, Washington, D. C., James R. Wolfe, Chicago, Ill., John M. Curphey, Robinson, Curphey & O'Connell, Toledo, Ohio, on brief.

Richard R. Lyman, Toledo, Ohio, and Donald W. Bennett, Cleveland, Ohio, for appellee; Harold C. Heiss, Russell B. Day, Heiss, Day & Bennett, Cleveland, Ohio, Richard M. Colasurd, Mulholland, Hickey & Lyman, Toledo, Ohio, on brief.

Before McCREE and COMBS, Circuit Judges, and CECIL, Senior Circuit Judge.

COMBS, Circuit Judge.

The Detroit and Toledo Shore Line Railroad [Shore Line] brought suit to enjoin a threatened strike by the Brotherhood of Locomotive Firemen and Enginemen [BLF&E]. The BLF&E counterclaimed, seeking to enjoin a change in work assignments proposed by Shore Line. The District Court dismissed Shore Line's complaint and issued the injunction sought by BLF&E, 267 F. Supp. 572 (1967). This appeal followed.

Shore Line's main line of railroad runs from Toledo, Ohio to Detroit, Michigan. Until 1961, all work assignments for Shore Line's crews started and ended at Lang Yard in Toledo. An increasing volume of business in Trenton, Michigan caused Shore Line to consider the establishment of a terminal there. A major difficulty in this regard stemmed from the fact that all of its work assignments for many years had originated at Lang Yard, thirty-three miles away. Thus, to service a train starting and ending its run in Trenton, it was necessary to transport the work crews to and from Lang Yard each day.

In 1961, Shore Line notified three unions representing its employees, including BLF&E, that certain designated work assignments would henceforth originate in Trenton. The unions served notice on Shore Line, pursuant to Section 6 of the Railway Labor Act, proposing certain special working conditions for employees who would operate out of Trenton. Conferences on these notices brought no agreement and the matter was referred to the National

Mediation Board. While the case was pending before the Board, Shore Line established two new work assignments to originate in Dearoad, Michigan, eleven miles north of Trenton. The crews operating out of Dearoad were driven to Trenton by a taxicab service operated by Shore Line.

When the Dearoad work assignments were announced, the BLF&E withdrew from the Mediation Board proceedings and, before a Special Board of Adjustment, challenged Shore Line's right to establish the new work assignments.[1] It was asserted that these assignments were contrary to the collective bargaining agreement between the parties. On November 30, 1965, the Special Board ruled that the Shore Line-BLF&E bargaining agreement did not prohibit the establishment of outlying work assignments.

Shortly after the action by the Special Board, Shore Line revived its plan to originate work assignments out of Trenton. Learning this, BLF&E served a Section 6 notice on Shore Line, proposing an amendment to the existing collective bargaining agreement to the effect that "all road service runs and/or assignments will originate and terminate at Lang Yard. * * *" The parties, being unable to agree, submitted the matter to the National Mediation Board. Notwithstanding this action, Shore Line posted notices announcing two work assignments to originate at Trenton. The BLF&E threatened to strike and this action was initiated.

The District Court enjoined Shore Line from "establishing or operating a terminal point at Edison Station, Trenton, Michigan, or any other terminal point not previously established. * * *" The injunction was grounded on the Section 6 requirement that, following issuance of a notice under that section or the National Mediation Board's proffer

of services, a carrier may not alter "rates of pay, rules, or working conditions" until Section 6 procedures have been exhausted.

■ Shore Line asserts that the District Court's decision is erroneous for two reasons. First, it is contended that the status quo provision in Section 6 of the Act applies only to changes in "rates of pay, rules, or working conditions" which are embodied in the bargaining agreement, and that no terminal point is established in the bargaining agreement. We find this argument to be lacking in merit for the reasons stated in the opinion of the District Judge.

■ Second, it is argued by Shore Line that the establishment of a railway terminal is not bargainable because it is a managerial prerogative. This argument would have great force if the District Court's judgment prevented the company from constructing physical facilities known as a "terminal" or from using such facilities as a terminal. But such is not the case. The controversy here is focused on where work assignments will commence and end—the place where employees will report on and off duty. We find nothing in the correspondence between the parties, in the testimony of the witnesses, or in the opinion of the District Judge which would indicate that the judgment of the District Court should be given a broader meaning.

The question before the District Court was whether the place where employees for many years have originated and terminated their work days is a "working condition" which can be changed unilaterally by the employer without exhausting the bargaining procedures required by Section 6 of the Act. We note that it is stated by the District Judge in his opinion: "The proposed rule actually seeks to establish that all

---

1. The BLF&E decided to treat the controversy as a "minor dispute." Under Section 3 of the Railway Labor Act, such disputes are settled by an Adjustment Board whose interpretation of the contract is binding on the parties. See Elgin, Joilet & Eastern Ry. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

crewmen will report to duty at Lang Yard and not 35 miles north of Toledo."

It was held by the District Judge that this is a proper subject for bargaining and, as we construe the judgment, that is all that was held. We agree with the reasoning of the District Judge and with his conclusion.

Judgment affirmed.