DETROIT & TOLEDO SHORE LINE RAILROAD
CO. *v.* UNITED TRANSPORTATION
UNION ET AL.

No. 29.   Argued October 20, 1969—Decided December 9, 1969

*Francis M. Shea* argued the cause for petitioner. With him on the briefs were *Ralph J. Moore, Jr., David W. Miller, James A. Wilcox,* and *John M. Curphey.*

*Richard R. Lyman* argued the cause for respondents. With him on the brief was *Clarence M. Mulholland.*

*Milton Kramer* filed a brief for the Railway Labor Executives' Association as *amicus curiae* urging affirmance.

MR. JUSTICE BLACK delivered the opinion of the Court.

This case raises a question concerning the extent to which the Railway Labor Act of 1926 [1] imposes an obligation upon the parties to a railroad labor dispute to maintain the status quo while the "purposely long and drawn out" [2] procedures of the Act are exhausted. Petitioner, a railroad, contends that the status quo which the Act requires be maintained consists only of the working conditions specifically covered in the parties' existing collective-bargaining agreement. Respondent railroad brotherhood contends that what must be preserved as the status quo are the actual, objective working conditions out of which the dispute arose, irrespective of whether these conditions are covered in an existing collective agreement. For the reasons stated below, we think that only the union's position is consistent with the language and purposes of the Railway Labor Act.

The facts involved in this case are these: The main line of the Detroit and Toledo Shore Line (Shore Line), petitioner's railroad, runs from Lang Yard in Toledo, Ohio, 50 miles north to Dearoad Yard near Detroit, Michigan. For many years prior to 1961, Lang Yard was the terminal at which all train and engine crews reported for

---

[1] 44 Stat. 577, as amended, 45 U. S. C. § 151 *et seq.*

[2] *Railway Clerks* v. *Florida E. C. R. Co.*, 384 U. S, 238, 246 (1966).

work and from which they left at the end of the day. As the occasions arose, the Shore Line transported crews from Lang Yard to perform switching and other operations at various points to the north, assuming the costs of transportation and overtime for the crew members. On February 21, 1961, the railroad advised respondent, the Brotherhood of Locomotive Firemen and Enginemen (BLF&E),[3] of its intention to establish "outlying work assignments"[4] at Trenton, Michigan, a point on the main line about 35 miles north of Lang Yard. These new assignments would have required many employees to report for work at Trenton rather than Lang Yard where they had been reporting. The BLF&E responded to this announcement by filing a notice under § 6 of the Railway Labor Act[5] proposing an amendment to the collective-

---

[3] The United Transportation Union, the successor organization to the Brotherhood of Locomotive Firemen and Enginemen, was substituted as party respondent by order of the Court, March 3, 1969. Respondents also include two officers of the BLF&E named in the original complaint.

[4] The parties treat the term "outlying work assignment" as meaning a work assignment with a reporting point for going on and off duty located elsewhere than at the Shore Line's principal yard, Lang Yard in Toledo, Ohio. We adopt that usage here.

[5] 44 Stat. 582, as amended, 45 U. S. C. § 156. Section 6, in its entirety, provides:

"Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been

bargaining agreement to cover the changed working conditions of the employees who would work out of Trenton. Section 6 requires both the carrier and union to give the other party a 30-day notice of an "intended change in agreements affecting rates of pay, rules, or working conditions." [6]  Since the union thus invoked the "major-dispute" settlement procedures of the Railway Labor Act,[7] the dispute first went to conference and, when the parties failed to agree between themselves, then to the National Mediation Board.

While the case was pending before the National Mediation Board, the Shore Line announced two new outlying assignments at Dearoad, Michigan, at the northern end of the line.  Because work crews could be taken by cab from Dearoad south to Trenton, the railroad concluded that it no longer needed to establish assignments at Trenton and so advised the Mediation Board.  When the Dearoad assignments were announced, the union withdrew from the Mediation Board proceedings, and, before a Special Board of Adjustment convened under § 3 of the Act,[8] challenged the railroad's right under the parties' collective agreement to establish outlying assignments.

finally acted upon as required by section 5 of this Act, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

[6] See n. 5, *supra*.

[7] A "major dispute" is one arising out of the formation or change of collective agreements covering rates of pay, rules, or working conditions. *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 722–727 (1945).

[8] 44 Stat. 578, as amended, 45 U. S. C. § 153.  At this point, the BLF&E was considering the controversy as a "minor dispute," *i. e.*, a dispute arising out of the interpretation or application of collective agreements.  Under § 3 of the Railway Labor Act such disputes are settled by an Adjustment Board whose interpretation of the collective agreement is binding on the parties. See *Elgin, J. & E. R. Co.* v. *Burley, supra,* at 722–727.

On November 30, 1965, the Special Board ruled that the Shore Line-BLF&E agreement did not prohibit the railroad from making the assignments.[9]

Relying in part on the ruling of the Special Board, the railroad notified the union on January 24, 1966, that it was reviving its plan for work assignments at Trenton. Again the union responded by filing a § 6 notice of a proposed change in the parties' collective agreement. This time the union sought to amend the agreement to forbid the railroad from making any outlying assignments at all. The parties were again unable to negotiate a settlement themselves, and on June 17, 1966, the union invoked the services of the National Mediation Board. While the Mediation Board proceedings were pending, the railroad posted a bulletin definitely creating the disputed work assignments at Trenton effective September 26, 1966. Faced with this unilateral change in working conditions, the union threatened a strike. The railroad then brought this action in the United States District Court to enjoin the BLF&E [10] from calling and carrying out the allegedly illegal strike. The union counterclaimed for an injunction prohibiting the Shore Line from establishing outlying assignments on the ground that the status quo provision of § 6 of the Railway Labor Act forbids a carrier from taking

---

[9] The Special Board of Adjustment found:

"What took place here was not a change in the recognized terminal, but simply amounted to an outlying assignment. There is nothing in the rules of agreement which precludes this carrier from establishing an outside assignment." App. 110.

[10] The Brotherhood of Railroad Trainmen was also named a defendant, as were several officers of both unions. The causes of action against the two brotherhoods were completely different, however, and the cases were treated as distinct at trial and on appeal. The Brotherhood of Railroad Trainmen is not involved in the present litigation at this stage.

unilateral action altering "rates of pay, rules, or working conditions" while the dispute is pending before the National Mediation Board. The pertinent part of § 6 provides: [11]

> "In every case where . . . the services of the Mediation Board have been requested by either party . . . , rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon . . . by the Mediation Board . . . ." 45 U. S. C. § 156.

The District Court dismissed the railroad's complaint, from which no appeal has been taken, but it granted the injunction sought by the union restraining the railroad from establishing any new outlying assignments at Trenton or elsewhere.[12] The United States Court of Appeals for the Sixth Circuit affirmed the issuance of the injunction against the railroad. 401 F. 2d 368 (1968). We granted certiorari, 393 U. S. 1116 (1969).

In granting the injunction the District Court held that the status quo requirement of § 6 prohibited the Shore Line from making outlying assignments even though there was nothing in the parties' collective agreement which prohibited such assignments. The Shore Line vigorously challenges this holding. It contends that the purpose of the status quo provisions of the Act is to guarantee only that existing collective agreements continue to govern the parties' rights and duties during efforts to change those agreements. Therefore, the railroad argues, what Congress intended by writing in § 6 that "rates of pay, rules, or working conditions shall

---

[11] The full section is set out in n. 5, *supra*.

[12] The order of the District Court is unreported. *Detroit & Toledo Shore Line R. Co.* v. *Brotherhood of Locomotive Firemen & Enginemen,* No. C 66–207 (D. C. N. D. Ohio, filed Nov. 15, 1966). The opinion of the District Court on motion to vacate the judgment is reported at 267 F. Supp. 572 (1967).

not be altered" was that rates of pay, rules, or working conditions *as expressed in an agreement* shall not be altered. And since nothing in the railroad's agreement with the union precluded the railroad from altering the location of work assignments, this working condition was not "expressed in an agreement." Thus, the argument runs, the railroad could make outlying assignments without violating the status quo provision of § 6, and the judgments below must be reversed.

We note at the outset that the language of § 6 simply does not say what the railroad would have it say. Instead, the section speaks plainly of "rates of pay, rules, or working conditions" without any limitation to those obligations already embodied in collective agreements. More important, we are persuaded that the railroad's interpretation of this section is sharply at variance with the overall design and purpose of the Railway Labor Act.

The Railway Labor Act was passed in 1926 to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce.[13] The problem of strikes was considered to be particularly acute in the area of "major disputes," those disputes involving the formation of collective agreements and efforts to change them. *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 722–726 (1945). Rather than rely upon compulsory arbitration, to which both sides were bitterly opposed, the railroad and union representatives who drafted the Act chose to leave the settlement of major disputes entirely to the processes of noncompulsory adjustment. *Id.,* at 724. To this end, the Act established rather elaborate machinery for negotiation, mediation, volun-

---

[13] In *Texas & N. O. R. Co.* v. *Railway Clerks,* 281 U. S. 548, 565 (1930), the Court said: "The Brotherhood insists, and we think rightly, that the major purpose of Congress in passing the Railway Labor Act was 'to provide a machinery to prevent strikes.'"

tary arbitration, and conciliation. *General Committee, B. L. E.* v. *Missouri-K.-T. R. Co.,* 320 U. S. 323, 328–333 (1943). It imposed upon the parties an obligation to make every reasonable effort to negotiate a settlement and to refrain from altering the status quo by resorting to self-help while the Act's remedies were being exhausted.[14] *Railroad Trainmen* v. *Terminal Co.,* 394 U. S. 369, 378 (1969); *Elgin, J. & E. R. Co.* v. *Burley, supra,* at 721–731; *Texas & N. O. R. Co.* v. *Railway Clerks,* 281 U. S. 548, 565–566 (1930). A final and crucial aspect of the Act was the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process. As we noted in *Railway Clerks* v. *Florida E. C. R. Co.,* 384 U. S. 238, 246 (1966), "the procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute."

---

[14] The Act's major-dispute procedures and status quo requirement were concisely stated in an opinion by MR. JUSTICE HARLAN only last Term, *Railroad Trainmen* v. *Terminal Co.,* 394 U. S. 369, 378 (1969):

"The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President,' who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10."

The Act's status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool; helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. Moreover, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce.

There are three status quo provisions in the Act, each covering a different stage of the major dispute settlement procedures. Section 6, the section of immediate concern in this case, provides that "rates of pay, rules, or working conditions shall not be altered" during the period from the first notice of a proposed change in agreements up to and through any proceedings before the National Mediation Board.[15] Section 5 First provides that for 30 days following the closing of Mediation Board proceedings "no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose," unless the parties agree to arbitration or a Presidential Emergency Board is created during the 30 days.[16] Finally, § 10

---

[15] Section 6 is set out in its entirety in n. 5, *supra*.

[16] Section 5 First, 44 Stat. 580, as amended, 45 U. S. C. § 155 First, provides in part:

"If arbitration at the request of the Board shall be refused by one or both parties, the Board shall at once notify both parties in writing that its mediatory efforts have failed and for thirty days thereafter,

provides that after the creation of an Emergency Board and for 30 days after the Board has made its report to the President, "no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose." [17]  These provisions must be read in conjunction with the implicit status quo requirement in the obligation imposed upon both parties by § 2 First, "to exert every reasonable effort" to settle disputes without interruption to interstate commerce.[18]

---

unless in the intervening period the parties agree to arbitration, or an emergency board shall be created under section 10 of this Act, no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose."

[17] Section 10, 44 Stat. 586, as amended, 45 U. S. C. § 160, provides in part:

"After the creation of such board and for thirty days after such board has made its report to the President, no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose."

[18] Section 2 First, 44 Stat. 577, as amended, 45 U. S. C. § 152 First, provides:

"It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

The relationship between the status quo provisions and § 2 First, was made explicit in the testimony of Donald Richberg who spoke as the unions' representative when the proposed railroad legislation was presented to Congress jointly by the railroads and the unions:

"As to maintaining the status quo from the time that a dispute is engendered, it is a violation of the duties imposed by this law for either party to take any action to arbitrarily change the conditions until that dispute has been adjusted in accordance with the law. Their primary duty is to exert every reasonable effort to avoid

While the quoted language of §§ 5, 6, and 10 is not identical in each case, we believe that these provisions, together with § 2 First, form an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30-day "cooling-off" period. Although these three provisions are applicable to different stages of the Act's procedures, the intent and effect of each is identical so far as defining and preserving the status quo is concerned.[19] The obligation

interruptions of commerce through disputes. The 'reasonable efforts' are set forth here that all disputes shall be considered and decided in conference, if possible; that, second, if conference fails a certain type of disputes shall be carried to the board of adjustment; the other type of disputes, or those not decided by the board of adjustment, may be carried to the board of mediators, and it shall be the duty of the board of mediators to act." Hearings on H. R. 7180 before the House Committee on Interstate and Foreign Commerce, 69th Cong., 1st Sess., 92–93 (1926).

[19] This interpretation of the status quo provisions is supported by the legislative history of the Act. See, e. g., the testimony of Donald Richberg set out in n. 18, supra. Mr. Richberg also testified:

"[T]he only thing that can provoke an arbitrary action [referring to strikes] is the power to arbitrarily change the rates of pay or rules of working conditions before the controversy is settled, and it is provided that they shall not be altered during the entire period of utilization of this law." Hearings on H. R. 7180 before the House Committee on Interstate and Foreign Commerce, 69th Cong., 1st Sess., 93 (1926).

Moreover, when the status quo provision of § 5 was added to that section in 1934, its purpose was to provide continuity between §§ 6 and 10 by preserving the status quo for 30 days following the end of proceedings before the Mediation Board. Joseph B. Eastman, Federal Co-ordinator of Transportation, the principal draftsman and proponent of the 1934 amendments, testified:

"As the present act reads, a railroad, by rejecting the Board of Mediation's final recommendation to arbitrate the dispute, is enabled to change the rates of pay, rules, or working conditions arbitrarily, prior to the issuance of an order by the President appointing a fact-finding board and maintaining the status quo for 60 days. . . . The

of both parties during a period in which any of these status quo provisions is properly invoked is to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute.[20]

It is quite apparent that under our interpretation of the status quo requirement, the argument advanced by the Shore Line has little merit. The railroad contends that a party is bound to preserve the status quo in only those working conditions covered in the parties' existing collective agreement, but nothing in the status quo provisions of §§ 5, 6, or 10 suggests this restriction. We have stressed that the status quo extends to those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement. Thus, the mere fact that the collective agreement before us does not expressly

railroads have taken advantage of this unintentional hiatus in the present law in several instances. The change now proposed is designed to plug this hole." Hearings on S. 3266 before the Senate Committee on Interstate Commerce, 73d Cong., 2d Sess., 21 (1934).

[20] The status quo provision of § 10 was the only one discussed in any depth at the 1926 congressional hearings on the bill. Donald Richberg, n. 19, *supra*, testified as follows when questioned about the intended scope of the status quo provision:

"The thought was to include in the broadest way all the factors which contributed to what is commonly called the status quo. In other words, the conditions may depend upon the dispute, whether it is with regard to rules or with regard to wages." Hearings on H. R. 7180 before the House Committee on Interstate and Foreign Commerce, 69th Cong., 1st Sess., 44 (1926).

"What broader phrase could be used than 'conditions out of which the dispute arose' which comprehends all the elements affecting the controversy? It is intended to make it clear that the parties are going to wait and give the Government full opportunity to adjust the controversy." Hearings on S. 2306 before the Senate Committee on Interstate Commerce, 69th Cong., 1st Sess., 88–89 (1926).

prohibit outlying assignments would not have barred the railroad from ordering the assignments that gave rise to the present dispute if, apart from the agreement, such assignments had occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions. Here, however, the dispute over the railroad's establishment of the Trenton assignments arose at a time when actual working conditions did not include such assignments. It was therefore incumbent upon the railroad by virtue of § 6 to refrain from making outlying assignments at Trenton or any other place in which there had previously been none, regardless of the fact that the railroad was not precluded from making these assignments under the existing agreement.[21]

The Shore Line's interpretation of the status quo requirement is also fundamentally at odds with the Act's primary objective—the prevention of strikes. This case provides a good illustration of why that is so. The goal of the BLF&E was to prevent the Shore Line from making outlying assignments, a matter not covered in their existing collective agreement. To achieve its goal, the union invoked the procedures of the Act. The railroad, however, refused to maintain the status quo and, instead, proceeded to make the disputed outlying assignments. It could hardly be expected that the union would sit idly by as the railroad rushed to accomplish the very result the union was seeking to prohibit by agreement. The union undoubtedly felt it could resort to self-help if the railroad could, and, not unreasonably, it threatened to strike. Because the railroad prematurely resorted to self-help, the primary goal of the Act came very close to being defeated. The example of this case could no doubt be multiplied many times. It would be virtually impossible to include all working conditions in a col-

---

[21] See n. 9, *supra*.

lective-bargaining agreement. Where a condition is satisfactorily tolerable to both sides, it is often omitted from the agreement, and it has been suggested that this practice is more frequent in the railroad industry than in most others.[22] When the union moves to bring such a previously uncovered condition within the agreement, it is absolutely essential that the status quo provisions of the Act apply to that working condition if the purpose of the Act is to be fulfilled. If the railroad is free at this stage to take advantage of the agreement's silence and resort to self-help, the union cannot be expected to hold back its own economic weapons, including the strike. Only if both sides are equally restrained can the Act's remedies work effectively. [23]

We now turn to answer some of the arguments advanced by the Shore Line in support of its position. The first of these involves § 2 Seventh of the Act. That section forbids a carrier from changing "the rates of pay, rules, or working conditions of its employees, as a class *as embodied in agreements* except in the manner prescribed in such agreements or in section 6 of this Act." [24] (Emphasis added.) The Shore Line argues that this section is a status quo provision and that the "as embodied in agreements" restriction it contains

---

[22] Brief of Railway Labor Executives' Association as *amicus curiae* 17.

[23] Respondent BLF&E has urged in its brief that we also consider the question whether the Shore Line violated a duty to bargain in good faith, citing *Fibreboard Corp.* v. *NLRB,* 379 U. S. 203 (1964), and *NLRB* v. *Katz,* 369 U. S. 736 (1962). Deciding the case as we do under the status quo provisions of the Act, we find it unnecessary to reach this argument.

[24] Section 2 Seventh, 48 Stat. 1188, 45 U. S. C. § 152 Seventh, provides as follows:

"No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 6 of this Act."

should be read into the status quo provisions of §§ 5, 6, and 10. We find no merit in this argument. Section 2 Seventh, which was added to the Act in 1934, does not impose any status quo duties attendant upon major dispute procedures. It simply states one category of cases in which those procedures must be invoked. The purpose of § 2 Seventh is twofold: it operates to give legal and binding effect to collective agreements, and it lays down the requirement that collective agreements can be changed only by the statutory procedures. The violation of this section is a criminal offense punishable by imprisonment or fine or both.[25] Violations of the status quo provisions of §§ 5, 6, and 10 are only civil wrongs.

Second, the Shore Line contends that the interpretation of § 6 which we adopt today is at variance with the position we have taken on two previous occasions, citing *Order of Conductors* v. *Pitney,* 326 U. S. 561 (1946), and *Williams* v. *Terminal Co.,* 315 U. S. 386 (1942). Although these cases do contain statements which out of context tend to support petitioner's position, neither dealt with the question we have before us today. *Pitney* involved a suit brought by a union to enjoin the reorganization trustees of a bankrupt railroad from transferring certain job assignments to another union. The plaintiff's contention was that the disputed jobs belonged to its members by both custom and agreement. The trustees were therefore prohibited from reassigning the jobs, the union argued, since they had never filed the appropriate notice of "intended change in agreements" required by § 6. The railroad disputed that the reassignments of the jobs would require a "change in agreements" and thus put the meaning of the parties' agreements in issue. We held that the proper forum for

---

[25] Railway Labor Act, § 2 Tenth, 48 Stat. 1189, 45 U. S. C. § 152 Tenth.

interpreting the agreements was the Adjustment Board provided by Congress in the Railway Labor Act, § 3 First (i), for that purpose, and directed the District Court to stay its proceedings accordingly. 326 U. S., at 567–568. Thus, *Pitney,* at most, involved a question of the necessity of filing a § 6 notice and was not at all concerned with the status quo provision of that section.

The *Williams* case is equally inapposite. In that case "redcaps" brought suit through their union representative against the Dallas railroad terminal to recover wages allegedly owed them and retained by the terminal in violation of the Fair Labor Standards Act and the Railway Labor Act. The redcaps' argument under the Fair Labor Standards Act was that Congress had not intended that tips be included in their wages for purposes of satisfying minimum wage requirements. Yet, that is what the terminal had done under its "accounting and guarantee" plan from October 1938, when the F. L. S. A. became effective, until March 1940. The majority of the Court rejected the redcaps' argument, holding that the F. L. S. A. neither prohibited nor required the inclusion of tips within wages. The question was held to be one for contract between the parties. 315 U. S., at 407–408. The redcaps' claim under the Railway Labor Act was that the terminal's "accounting and guarantee" plan under which tips were considered as part of wages was put into operation unilaterally by the terminal on the effective date of the F. L. S. A., despite the fact that the redcaps had two weeks earlier asked for a conference to negotiate an agreement which would include the subject of wages. This, the redcaps argued, violated the status quo provisions of § 6 since prior to the F. L. S. A. tips had not been included in wages. The Court concluded, however, that § 6 was not applicable to the dispute between the parties. The Court reasoned that when the redcaps continued to work after being individ-

ually notified of the "accounting and guarantee" plan, new and independent contracts were formed between each redcap and the terminal. The Court held that these contracts were not affected by the pending request for collective bargaining under the Railway Labor Act. The decision rested partially on the ground that "[i]ndependent individual contracts are not affected by the Act." 315 U. S., at 399. And the Court also said more narrowly that the status quo requirements of § 6 were inapplicable since that section applies only when a "change in agreements" is involved. 315 U. S., at 400. In *Williams* there was absolutely no prior history of any collective bargaining or agreement between the parties on any matter. Without pausing to comment upon the present vitality of either of these grounds for dismissing the redcaps' Railway Labor Act claim, it is readily apparent that *Williams* involved only the question of whether the status quo requirement of § 6 applied at all. The Court in *Williams* therefore never reached the question of the scope of the status quo requirement in a dispute, such as the one before the Court today, to which that requirement concededly applies.

Finally, the Shore Line points out, quite correctly, that its position on § 6 is identical to that taken by the National Mediation Board in several of its Annual Reports.[26] However, the Mediation Board has no adjudicatory authority with regard to major disputes, nor

---

[26] The 34th Annual Report of the National Mediation Board stated:

"Section 6 states that where notice of intended change in an agreement has been given, rates of pay, rules, and working conditions *as expressed in the agreement* shall not be altered by the carrier until the controversy has been finally acted upon in accordance with specified procedures." NMB, 34th Ann. Rep. 23 (fiscal year ended June 30, 1968). (Emphasis added.) See also NMB, 33d Ann. Rep. 36 (fiscal year ended June 30, 1967); NMB, 31st Ann. Rep. 25 (fiscal year ended June 30, 1965).

has it a mandate to issue regulations construing the Act generally. Certainly there is nothing in the Act which can be interpreted as giving the Mediation Board the power to change the plain, literal meaning of the statute, which would be the result were we to adopt its interpretation of § 6.

The judgment is

*Affirmed.*

MR. JUSTICE HARLAN, with whom THE CHIEF JUSTICE joins, concurring in part and dissenting in part.

I fully agree that the application of § 6 should not be restricted to only those terms of employment that the parties have seen fit to embody in a written agreement. Section 6 may properly, in some circumstances, be extended to "freeze" *de facto* conditions of employment. I cannot, however, accept what appears to be the majority's test for determining when a § 6 freeze is appropriate.[1] Any work practice is, in the words of the majority, an "actual, objective working condition." However, the practice of today may not be the accepted condition of yesterday, but rather a temporary expedient in which neither party acquiesces. I find it difficult to think that Congress intended that either party, by serving a § 6 notice, should be able to shackle his adversary and tie him to a condition that has been historically and consistently controverted.

Rather, what persuades me to countenance the extension of § 6 beyond the terms of a written collective-bargaining agreement is the fact, observed by the Court, that "[w]here a condition is satisfactorily tolerable to both sides, it is often omitted from the agreement . . . ," *ante,* at 155. Taking this observation as a point of de-

---

[1] The majority first announces a test looking to "actual, objective working conditions," *ante,* at 153. This is later qualified by a durational requirement, but no general principle of decision is set forth.

parture, I favor a more subjective approach than the objective and mechanical one implicit in the majority's language. The question that should be asked is whether in the context of the relationship between the principals, taken as a whole, there is a basis for implying an understanding on the particular practice involved. To this end it is necessary to consider not only the duration of the practice but also all the dealings between the parties, as for example, whether the particular condition has been the subject of prior negotiations.

While I recognize, of course, that any subjective test is not easily applied, I cannot subscribe to a rule that may have the incongruous effect of perpetuating what both parties in fact view as a disputed practice, simply because neither party, for reasons of convenience, has exercised a recognized option of resorting to self-help.

Under this standard I consider that the proper disposition of the case before us is to remand to the District Court for additional findings.[2] While the District Court found that "[f]or many years prior to 1961" Lang Yard was the established terminal point for reporting to duty, that finding alone would not satisfy a subjective test in light of subsequent events that may have negatived any understanding that might have existed prior to 1961.[3] In 1961 the Shore Line advised the union of a contemplated shifting of reporting to its Trenton terminal some 30 miles north. The proposal apparently met with employee resistance and the union served a § 6

[2] While the District Court and the Court of Appeals both properly rejected petitioner's theory, restricting § 6 to terms embodied in a written agreement, it is by no means clear to me precisely what standard they followed in concluding that the Act was applicable.

[3] The District Court, as I read its findings, does not appear to have considered the possible impact of the train of events revealed by the record in connection with 1961–1963 proceedings before the Board.

notice seeking to modify the agreement with the railroad. By 1963 the parties had exhausted the statutory mediation route without reconciling their differences and the Mediation Board recommended arbitration to break the impasse. This proposal was rejected by the company which declared the dispute moot since, by that time, it had abandoned its Trenton project. Meanwhile, the company embarked on a practice of transporting employees at its own expense and on company time from its Dearoad terminal, 11 miles north of Trenton, a practice which is the subject of a separate § 6 notice.

In my opinion a remand is called for to determine whether the company's voluntary abandonment of its Trenton project, coupled with its undertaking to transport employees from Dearoad at its own cost and the long-established practice prior to 1961, amounted to acceptance in principle of Lang Yard as the reporting location.

For that reason I respectfully dissent from the Court's affirmance of the Court of Appeals.