George P. BAKER et al.

v.

RAILROAD YARDMASTERS OF AMERICA et al.

Civ. A. No. 71–2365.

United States District Court,
E. D. Pennsylvania.

Aug. 18, 1972.

Hermon M. Wells, Philadelphia, Pa., for plaintiffs.

Herbert G. Schick, MacCoy, Evans & Lewis, Philadelphia, Pa., for defendants.

### MEMORANDUM OPINION AND ORDER

VanARTSDALEN, District Judge.

This action arises from a complaint by the plaintiffs, Trustees of the Property of Penn Central Transportation Company, seeking to enjoin a threatened strike by the defendants, Railroad Yardmasters of America (RYA). RYA answered and counterclaimed also requesting injunctive relief.

■■ After the issuance of a temporary restraining order preventing a strike, the parties agreed that the court need only consider the two issues involving Section 6 notices of the Railway Labor Act (45 U.S.C. § 156)[1] concerning the abolishment of yardmasters' jobs and the programming or laying out of work by yardmasters for the next succeeding shift. Both of the disputes concern rates of pay, rules or working conditions; are thereby defined as major disputes, Elgin, Joliet and Eastern Railway Co. v. Burley, 325 U.S. 711, 722–724, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945); and are subject to the notice and status quo provisions of Section 6 of the Railway Labor Act. This section requires the union and company to give thirty days' written notice of changes affecting rates of pay, rules or working conditions and that during the following bargaining period, from the date of the Section 6 notice to final mediation, there will be no changes in the existing rates of pay, rules, or working conditions. The purpose of the latter "status quo" provision is to avoid the employment of self-help by either party. *Elgin, supra.* As the Supreme Court stated in Detroit and Toledo Shore Line Railroad Co. v. United Transportation Union, 396 U.S. 142, 150, 90 S.Ct. 294, 299, 24 L.Ed.2d 325 (1969):

> "The Act's status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout."

To insure that there is no resort to self-help, this court has been given the responsibility of enforcing Section 6 through the use of injunctive relief. *Shore Line, supra*; Southern Railway Co. v. Brotherhood of Locomotive Firemen and Enginemen, 119 U.S.App.D.C. 91, 337 F.2d 127 (1964); Manning v. American Airlines, Inc., 329 F.2d 32 (2nd Cir. 1964).

The issue of job abolishments arose when the Penn Central, in May, 1971, authorized the Sharp Committee to undertake a systematic evaluation of yardmasters' positions in an effort to attain maximum utilization of these employees.[2] As a result, the carrier in-

---

1. § 156. *Procedure in changing rates of pay, rules, and working conditions*

   Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board. May 20, 1926, c. 347, § 6, 44 Stat. 582; June 21, 1934, c. 691, § 6, 48 Stat. 1197.

2. The committee was comprised of J. H. Palmer and J. H. Sharp.

stituted wholesale job abolishments to which the union objected and filed a Section 6 notice on September 16, 1971.[3] The dispute was unsuccessfully negotiated in conference and presently is under the jurisdiction of the Mediation Board.

The pivotal issue in this dispute is establishing the status quo at the time of the Section 6 notice. The status quo has been defined to include "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Shore Line, supra,* 396 U.S. at 153, 90 S.Ct. at 301; Baker v. United Transportation Union, AFL–CIO, 455 F.2d 149, 153 (3rd Cir. 1971).

The carrier contends that the abolishing of the yardmasters' positions is part of the status quo due to Rule 5–B–1 of the collective bargaining agreement permitting job abolishment on thirty-six hours' notice. It also cites Article IV of the agreement of April 27, 1956, which involves the assignment of work following the abolishment of a yardmaster position. The carrier also cites the hearing record where RYA admitted that the carrier had the right to abolish these jobs.

■ Under these circumstances, there is little question that the abolishment of yardmasters' jobs qualifies as part of the status quo. There is no clearer example of a "working condition or practice in effect prior to the time the dispute arose" than one which has been agreed upon by both the union and carrier, integrated into a written contract and exercised prior to the issuance of a Section 6 notice. In this case, the carrier's right to abolish yardmasters jobs is directly referred to in Rule 5–B–1 of the collective bargaining agreement effective since 1947. Also, Article IV of the 1956 agreement clearly infers that the carrier has the right to abolish jobs by its reference to the regulation of the assignment of work after a yardmaster's position has been abolished. In addition, RYA even admits that the company has this right.

The record indicates that the carrier not only has the right to abolish jobs but also that the right has been exercised prior to the present dispute. While the jobs were not as systematically abolished as after the Sharp Committee's evaluations, the record does show that the carrier had sporadically abolished jobs in sufficient numbers prior to any RYA protests to qualify the action as a working condition and part of the status quo.

■ Finally, where the right exists prior to the Section 6 notice, the issuance of the notice will not affect the working practice since it is part of the status quo prior to the incident. United Transportation Union, Local Lodge No. 31 v. St. Paul Union Depot Company, 434 F.2d 220 (8th Cir. 1970), cert. denied, 401 U.S. 975, 91 S.Ct. 1194, 28 L. Ed.2d 324 (1971). For these reasons, the defendants will be denied injunctive relief against the plaintiffs' abolishment of yardmasters' positions.

■ Entirely different circumstances are present with respect to the issue of the yardmaster programming or "laying out" work beyond his tour of duty. The carrier contends that, during negotiation of the dispute, it can require the yardmaster to plan out work for the next succeeding shift since this procedure is again a working practice or condition and part of the status quo. The facts do not substantiate this allegation.

The record indicates that only on two occasions did the carrier require a yardmaster to lay out work. On both occasions RYA protested the action and the programming out of work ceased. In 1961, at Phillipston, Pennsylvania, and in 1968 at Weigh Scales, Pennsylvania, the carrier abolished the yardmaster's job on the second trick or shift. The

---

3. As of the hearing date, October 15, 1971, 150 yardmasters' jobs had been abolished since January 1, 1971. Also, as of the former date, approximately 900 yardmasters were employed by the carrier.

carrier then required the first shift yardmaster to plan out work for the second shift. The Phillipston incident was protested by RYA and a claim was processed through the grievance procedure. Though the claim was denied, the issue became moot when the second shift's operations were discontinued. With respect to the incident at Weigh Scales, though the claim was again denied and taken to the Fourth Division of the National Railway Adjustment Board, it was withdrawn by RYA again because the practice was discontinued and the operations at Weigh Scales subsequently closed. On October 22, 1969, RYA then served a Section 6 notice concerning the programming out of work which presently is being considered by the Mediation Board.

Though the definition of a working condition and practice must be "broadly conceived," the facts surrounding the programming out of work do not constitute a working condition or practice within the purview of the Supreme Court's definition of status quo. The carrier must prove that the programming out "had occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working condition." *Shore Line, supra,* 396 U.S. at 154, 90 S.Ct. at 301. The foregoing has not been proved. Clearly the two instances of programming out of work do not demonstrate a "pattern of conduct," *St. Paul Union Depot Co., supra;* the timely objections by RYA evidence no acquiescence by the employees and will disallow the laying out of work from becoming a "prerogative to be exercised unilaterally by the railroad." Baker v. United Transportation Union, *supra,* 455 F.2d at 156. In short, the carrier has failed to prove either of the two elements establishing a working condition or practice; *i. e.,* sufficient frequency of occurrence and expressed or implied agreement by the employees.

Finally, Rule 407 of the Carrier's Operating Rule Book or the Rules for Governing Transportation, as published by the carrier, designates the duties of a yardmaster to include supervision of the train crews in the makeup and breakup of the train in the yards. Nowhere in the written rules is there denoted the duty of laying out work for the next shift. For the above reasons, plaintiffs will be enjoined from requiring the defendants to program out work during the pendency of the Section 6 dispute.