**UNITED TRANSPORTATION UNION,**
**Plaintiff,**

v.

**PENN CENTRAL TRANSPORTATION**
**COMPANY et al., Defendant.**

**Civ. A. No. 73-1727.**

United States District Court,
E. D. Pennsylvania.

Aug. 10, 1973.

Cornelius C. O'Brien, Jr., Philadelphia, Pa., for plaintiff.

Hermon M. Wells, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

CLIFFORD SCOTT GREEN, District Judge.

Plaintiff, The United Transportation Union ("Union") commenced this action to obtain an injunction to prevent Penn Central Transportation Company ("Company"), defendant herein, from unilaterally establishing an extra list of trainmen for the Prior Right Pittsburgh Seniority District at Conway, Pennsylvania. The Union contends that it is entitled to an injunction to maintain the "status quo" in accordance with the provisions of the Railway Labor Act of 1926, 45 U.S.C. § 151 et seq. The Union charges that the changes Penn Central attempted to establish unilaterally are presently the subject of conference, pursuant to a Section 6 notice served on the Union by Penn Central on April 19, 1973.[1]

---

1. Section 6, 45 U.S.C. § 156 provides: "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has prof-

The notice proposed the changing, elimination or establishment of many rules, and the one here involved reads as follows:

"ON AND OFF DUTY POINTS

Establish a new rule which permits the Carrier to:

1. Establish or abolish terminals or locations for outpost or outlying assignments.

2. Establish on or off duty points within existing terminals.

3. Establish an extra list at any location where there is sufficient work to warrant an extra list, or combine separate extra lists headquartered at the same location.

Existing transportation arrangements and arbitraries, special or constructive allowances requiring payment to employees account being required to fill assignments that commence and/or are relieved within existing terminals or at outlying points are eliminated."

The proposals are still in conference; however, the Company has taken steps to unilaterally establish an extra list at Conway. Penn Central contends it has a right to establish the "extra list" at Conway and argues it is merely continuing a practice under which the Penn Central or its predecessor has previously taken action without union concurrence. Thus, Penn Central argues an injunction should not issue because the "status quo" includes its prior established right to unilaterally make the change.

An answer to the Complaint was filed by Penn Central, which admitted most of the averments of the complaint; thereafter, we held an evidentiary hearing to permit the parties to present evidence on the remaining issue in dispute, i. e., what constitutes the "status quo". Pending determination by the Court, Penn Central has agreed to refrain from establishing the extra list.

From the admissions in the pleadings and the evidence presented at hearing, we find the following facts: Plaintiff, a labor organization, represents trainmen employed by Penn Central. There is in effect a collective bargaining agreement between the parties, but said agreement is silent on the respective rights of the parties in regard to establishing extra lists at outlying points.[2] Conway, Pennsylvania, is an outlying point and has been so considered since approximately 1956. Also, regular crews are assigned to Conway. The extra list at Pittsburgh is used to supply extra trainmen when needed at Conway; an extra trainman is paid from the time he reports to the Pittsburgh yard and thus is paid for the time involved in traveling to Conway; in addition, the Penn Central is required to provide the extra trainmen transportation between Pittsburgh and the outlying point, Conway. One of the reasons Penn Central seeks to establish the extra list at Conway and reduce the one at Pittsburgh is to save the extra pay, and transportation costs involved in having the men report at Pittsburgh. Of course, the Union objects to the change because it will eliminate the "deadhead pay", and thus adversely affect its members in their pay, rules and working conditions.

fered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally .acted upon, as required by Section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

2. Rule 5–E–1 provides: "EXTRA TRAINMEN WORKING AT OUT-LYING POINTS. Extra trainmen sent away from their home terminals to outlying points shall not be required to remain there longer than one week at a time unless the business requires it. This time limit may be reduced on any seniority district if mutually agreed to by the Superintendent, Personnel and Local Committee or Committees of the Organization signatory hereto. Deadhead pay shall be allowed only to the first trainmen for the going trip and to the last trainman for the returning trip."

■ Penn Central recognizes the obligation of both parties to maintain the "status quo" but by testimony of Mr. Swert, its director of labor relations, attempted to prove that the right to establish the extra list at Conway exists as a matter of established practice and custom and, therefore, is a part of the status quo to be maintained. Mr. Swert testified that extra lists, similar to the Pittsburgh Seniority District trainmens' extra list proposed for Conway, had been previously established without Union approval and cited the New York extra list at Harrisburg, the Conemaugh extra list at Conway, the Williamsport extra list at Enola, and a Chesapeake extra list at Philadelphia. Notwithstanding the testimony of Mr. Swert, there is no evidence, except in regard to the Conemaugh list, that any of the previously established extra lists involved the establishment of a list at an outlying point, or that such extra lists involved the crucial factor of eliminating deadhead pay. In regard to the Conemaugh extra list at Conway, Mr. Swert testified to the establishment of an extra list at Conway in 1932; he testified Conway was an outlying point. Mr. Wible, the General Chairman of the Union, denied that an outlying point was involved in the Conemaugh extra list at Conway. After considering the conflicting testimony, we cannot find as a fact, as Penn Central urges, that the Conemaugh-Conway extra list involved the establishment of an extra list at an outlying point, under the circumstances there involved, or that it resulted in the loss of deadhead pay to the trainmen.[3] One other item of evidence warrants mention in regard to the issue of practice and custom. Penn Central described the proposal in its Section 6 Conference Notice as the establishment of a new rule, and did not initially claim a prior right by estab-

lished practice; this is a significant indication of the Company's true feeling concerning the character of the proposal, and this is so even after considering the Company's explanation that it must be read in conjunction with a "savings clause" in the notice.

■ We are convinced, after a careful consideration of all the evidence, that Penn Central does not have a right, established by practice or custom, to unilaterally establish an extra list, at the outlying point of Conway, as proposed.

Penn Central, by its Section 6 Notice, has moved to bring the previously uncovered condition, regarding the establishment of extra lists at outlying points, within the agreement, and it is now obligated under the Railway Labor Act to maintain the status quo, which does not include a right to establish the extra list unilaterally. In Detroit & Toledo S. L. R. Co. v. United Transp. U., 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), a case which also involved an attempt by a railroad to abolish deadhead pay, by establishing an extra list at an outlying point, the Supreme Court stated:

"We have stressed that the status quo extends to those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement. Thus, the mere fact that the collective agreement before us does not expressly prohibit outlying assignments would not have barred the railroad from ordering the assignments that gave rise to the present dispute if, apart from the agreement, such assignments had occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of

3. While the evidence does not support Penn Central's position that the establishment of the Conemaugh-Conway extra list is similar to the extra list at Conway, as proposed in the instant case, we note that even if the circumstances were

identical, this one, isolated instance, which occurred more than 40 years ago, would not be sufficient to warrant a finding of an "established practice" entitled to be considered a part of the status quo.

the actual working conditions. Here, however, the dispute over the railroad's establishment of the Trenton assignments arose at a time when actual working conditions did not include such assignments. It was therefore incumbent upon the railroad by virtue of § 6 to refrain from making outlying assignments at Trenton or any other place in which there had previously been none, regardless of the fact that the railroad was not precluded from making these assignments under the existing agreement." 396 U.S. at 153–154, 90 S.Ct. at 301.

Similarly, Penn Central may not establish the extra list while proceedings under Section 6 are in process.

We have considered the cases cited by Penn Central, particularly, Baker v. United Transportation Union, AFL CIO, 455 F.2d 149 (3rd Cir. 1971); United Transp., Loc. L. No. 31 v. St. Paul Union Depot Co., 434 F.2d 220 (8th Cir. 1970), cert. denied, 401 U.S. 975, 91 S. Ct. 1194, 28 L.Ed.2d 324 (1971), and Baker v. Railroad Yardmasters of America, 347 F.Supp. 215 (E.D.Pa.1972); they are, of course, inapplicable to the instant action because in each of the aforesaid cases an "established practice" was found to exist from the evidence in the case. Here, we have expressly found that no such established practice exists and accordingly Penn Central does not have a unilateral right to establish the extra lists at the outlying point of Conway.

We have also carefully examined Local 1477, United Transportation Union v. Baker, 482 F.2d 228 (6th Cir. 1973) and it is inapplicable for there the District Court did not have jurisdiction to grant injunctive relief for a "minor dispute" involving interpretation of an existing agreement. Here, we have jurisdiction over this "major dispute", under Section 6 of the Act, involving bargaining over a change in pay, rules or working conditions.

For the reasons set forth above, we grant plaintiff's request for injunctive relief.