**DISTRICT 146, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, Plaintiff,**

v.

**TACA INTERNATIONAL AIRLINES, S. A., Defendant.**

**No. 77–2180–Civ–JLK.**

United States District Court, S. D. Florida.

March 15, 1979.

442

Manners & Amoon, Miami, Fla., for plaintiff.

Herbert B. Mintz, Miami, Fla., for defendant.

## FINAL JUDGMENT

JAMES LAWRENCE KING, District Judge.

The plaintiff-labor union brought this action under the Railway Labor Act to enforce the award of an arbitrator in which the defendant-employer, Taca, was ordered to reinstate a discharged employee, Boris Martinez. (Count I). The plaintiff also seeks to enjoin an alleged attempt by Taca to exchange the working conditions of its employees without compliance with the provisions of Section 6 of the Railway Labor Act, 45 U.S.C. § 156. (Count II). This court has jurisdiction to enforce the provisions of the Railway Labor Act pursuant to 28 U.S.C. § 1337. After carefully considering the evidence presented at the non-jury trial of this case, the court has determined that final judgment shall be entered in favor of the plaintiff.

## I. FINDINGS OF FACT

Boris Martinez was hired by the defendant, Taca, on April 1, 1970, and by the time of his discharge on November 24, 1976, he had attained the job classification of Senior Agent, as described in Article IV of the Collective Bargaining Agreement between Taca and the plaintiff-union. There are two locations at which Senior Agents are employed by Taca—the terminal ticket office and the cargo office. The job functions of the Senior Agent at the terminal location include ticketing passengers, collecting head taxes, making passenger reservations, meeting passengers, verifying return space for passengers, and completing the attendant paperwork. The Senior Agent at the cargo office is required to perform the same type of paperwork tasks, but in relation to cargo rather than passengers. The Senior Agent at the cargo location, therefore, unlike the Senior Agent at the terminal location, has minimal contact with the general public.

For several years prior to the time Martinez was discharged, assignments were made to each location based upon a seniority bidding system. Although this location assignment system was not specifically set forth in the Collective Bargaining Agreement, the court finds that it was a well-established practice at Taca at that time, and there was at least an implied mutual agreement that employees had the right to be assigned in this manner. It was under this system that Martinez had been assigned to the ticket office at the time he was discharged.

Martinez protested his termination by filing a grievance pursuant to the Collective Bargaining Agreement. After an evidentiary hearing before a neutral arbitrator, an award was entered in favor of Martinez, and Taca was ordered to "reinstate Mr. Martinez to his former position and classification without loss of seniority or other benefits to which he is entitled under the collective bargaining agreement." Pursuant to this decision by the arbitrator, Taca reinstated Martinez as a Senior Agent, but assigned him to the cargo office rather than the terminal ticket office. Martinez protested this assignment, claiming that under the terms of the arbitrator's award he was entitled to be assigned to the terminal office. Shortly thereafter, when the new bidding schedules were released, Taca entirely eliminated the practice of bidding job location—i. e., cargo or terminal—by seniority, and Martinez was assigned once more to the cargo office. The union protested this change, claiming that it was a unilateral change in working conditions that was improper in the absence of compliance with the provisions of Section 6 of the Railway Labor Act. This section requires an employer to give thirty days written notice of an intended change in agreements affecting working conditions. If the union and management cannot reach agreement regarding the proposed change, the services of the Mediation Board may be requested to resolve the dispute. Section 6 further provides that during this period of negotiation and mediation the status quo must be maintained and, therefore, the working conditions in question cannot be changed unilaterally. There is no dispute in this case that Taca did not follow any of the above provisions. The dispute is whether compliance with these provisions was necessary in light of the particular change made.

The defendant has suggested that the claim in Count I for enforcement of the

arbitrator's award has become moot since the assignment of Martinez under the new bidding schedule supersedes his reinstatement pursuant to the award under the old bidding schedule. Since the court has determined that the plaintiff is entitled to judgment on Count II of his complaint, and the relief afforded under that count includes the relief requested under Count I, the court does not reach the issue of mootness. The narrow issue presented by Count II is whether the past practice of assigning job location by seniority was so entrenched that it supplemented the collective bargaining agreement and became a part of the mutually agreed upon working conditions of the Taca employees. If so, then this is a major dispute over which this court has jurisdiction, and Taca violated the Railway Labor Act by failing to comply with Section 6.

Since this case presents the rare combination of international revolutionary intrigue surrounding a rather commonplace dispute over domestic working conditions, a glimpse of the background provides an enlightening perspective and flavor to this case. The following discourse is based upon the findings of fact and award made by the neutral arbitrator, which of course, this court has no power to modify.

The events in question actually began several years prior to the time that Martinez was hired by Taca, while he was a Colonel in the Panamanian National Guard. From this position, in 1968, he led a coup d'etat which resulted in the overthrow of the incumbent government, and the installation of Omar Torrijos as President of Panama. Shortly thereafter, Martinez was exiled by President Torrijos and entered the United States as a political refugee. He then obtained employment at Taca, but his revolutionary activities did not end. Rather, in October of 1976, Martinez sent a letter to approximately 250 of his friends in the Panamanian National Guard. In this letter, Martinez attacked the Torrijos government and urged his national guard friends to "sacrifice everything in their struggle for a quick triumph of liberty, democracy and justice" and to disobey "orders of brutal repression given by the ty-

rant." This letter subsequently was duplicated by unknown persons and distributed throughout Panama.

Shortly after the above events, Taca became the subject of harassment by the Panamanian government. Its planes were frequently delayed, and Taca was informed unofficially that it might lose its landing rights in Panama City. Taca also was informed unofficially that such harassment would continue until Taca terminated the employment of Mr. Martinez. It was in response to this pressure that Martinez was discharged, and Taca has not suffered from any acts of harassment since that time.

The arbitrator's award of reinstatement was based upon the finding that Taca had failed to demonstrate that the actions of Martinez were the sole and direct cause of Taca's problems. Rather, the arbitrator found that the problems were caused by the unauthorized duplication and general distribution of the letter, and that Martinez had no control over those actions. Faced with this order of reinstatement, Taca attempted to minimize the visibility of Martinez and limit his contact with the public by re-assigning him to the cargo rather than terminal office.

The court is sympathetic to the plight in which Taca has found itself, and if this court were making the initial decision on the propriety of the discharge, a different result might have been obtained. In this case, however, we must start with the proposition that reinstatement is required. From there we move to the determination of whether Taca had the right to unilaterally change job locations of employees, and thus whether its actions regarding the reinstatement of Martinez violated the provisions of Section 6, and if so, a fortiori, violated the award of the arbitrator. It is to these determinations the court now turns.

## II. CONCLUSIONS OF LAW

■ Both parties agree that this court has jurisdiction to resolve the issue in this case only if the dispute regarding job location assignments is classified as a major dispute rather than a minor dispute. In

general, major disputes involve "the formation or change of collective agreements covering rates of pay, rules, or working conditions." *Detroit & Toledo S.L.R. Co. v. United Transportation Union*, 396 U.S. 142, 145 n.7, 90 S.Ct. 294, 296 n.7, 24 L.Ed.2d 325 (1969). A major dispute, therefore, is the stuff of which strikes and lockouts generally are made. Minor disputes, on the other hand, involve individual grievances which can be resolved by interpretation of the collective bargaining agreement. *See Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). Based upon these general principles, this court has jurisdiction to enjoin the actions of Taca only if it finds that the job location assignment system was an established working condition that Taca changed. This jurisdictional finding of a dispute over a changed working condition will also determine the merits of this case because if there was such a change, the Section 6 provisions were mandatory.

The defendant asserts that this is a minor dispute which can be resolved through the interpretation of Article II(c), Article IV, and Article IX of the Collective Bargaining Agreement. Article II(c) provides in pertinent part:

> In the performance of their duties, employees covered by this Agreement shall be governed by Company rules, regulations and orders issued by properly designated authorities of the Company, provided such rules, regulations and orders are not in conflict with the terms and conditions embodied by this Agreement.

Article IV of the Agreement sets forth the job classifications and work requirements for each position. It contains job descriptions for the classifications of Senior Agent and Agent, but does not contain any reference to the job location. Article IX describes certain seniority rights which accrue to covered employees. It includes provisions for choice of vacancies, reduction in force, re-employment due to reduction in force, temporary assignment, choice of days off where seven days coverage exists and vacations. It does not include, however, other rights which traditionally have been assigned according to seniority, such as job

location and hours of work. The defendant contends, therefore, that since a change in job location assignment does not conflict with any explicit provision in the Agreement, Article II can be interpreted to give Taca the right to make job location assignments in its discretion. Since this interpretation would resolve the dispute, the defendant argues that this is a minor dispute that should be resolved through grievance procedures.

■ Careful scrutiny of the defendant's argument reveals its fatal flaw. Under the defendant's theory, Taca would be entitled to make any unilateral changes in the working conditions of its employees as long as the working conditions in question were not set forth explicitly in the collective bargaining agreement, and this court would be without jurisdiction to determine whether the change involved an established working condition and thus violated the notice and status quo requirement of Section 6. This theory runs contrary to the decision of the United States Supreme Court in *Detroit & Toledo S.L.R. Co. v. United Transportation Union, supra*. There, the Court held that the Section 6 requirements could not be restricted solely to those working conditions which were specified in the Collective Bargaining Agreement, but must also be applied to "the actual, objective working conditions out of which the dispute arose, irrespective of whether these conditions are covered in an existing collective agreement." 396 U.S. at 143, 90 S.Ct. at 295. The Court reasoned that the purpose of the cooling off period and other provisions of Section 6 was to prevent strikes, lockouts and, in general, the interruption of commerce. Since it would be impossible for the parties to include all working conditions in a collective agreement, the court found that certain established conditions that were satisfactory to both sides were often omitted. Yet changes in these "unincluded" working conditions were just as likely to cause interruptions in commerce as changes in the specified, bargained-for working conditions. Therefore, in view of the overall purposes of the Railway Labor Act, it would not make sense to exclude the "unincluded"

working conditions from the provisions of Section 6.

█ This is not to say, however, that an employer can never make any changes in the operation of his business without following Section 6 procedures. Rather, Section 6 comes into play only where the prior working condition has been of sufficient duration and moment so that a unilateral change creates the real potential of a strike or lockout. The factors that should be taken into account in making this determination include the mutual intent of the parties, their knowledge of and acquiescence in the prior acts, and evidence of whether there was joint participation in the prior course of conduct. In addition, prior bargaining over the particular condition, where it exists, may be relevant. *See Detroit & Toledo S.L.R. Co. v. United Transportation Union, supra,* 396 U.S. at 160, 90 S.Ct. 294 (partial concurrence of Mr. Justice Harlan); *United Transportation Union, Local Lodge No. 31 v. St. Paul Union Depot Co.,* 434 F.2d 220 (8th Cir. 1970).

█ Based upon all the evidence presented in this case, and particularly in light of the fact that the job location bidding system was a formalized procedure that had been in effect for years without dispute prior to the situation involving Martinez, the court concludes that the prior action of Taca of assigning job location by seniority was an established working condition which supplemented the collective bargaining agreement. The unilateral change in this working condition, therefore, created a major dispute over which this court has jurisdiction.

Having concluded that there was an .established working condition, there is no doubt, as previously discussed, that the provisions of Section 6 must be followed prior to any change. Therefore, the defendant Taca, must be enjoined from further implementation of this changed practice, and must be ordered to return to the status quo.

Based upon the foregoing discussion, the court does

ORDER AND ADJUDGE that Taca International Airlines, S.A. is permanently enjoined from unilaterally altering the status quo practice of allocating job locations according to seniority, without compliance with Section 6 of the Railway Labor Act. If Taca wishes to change this established working condition, it must comply with the provisions of Section 6, 45 U.S.C. § 156. The status quo must be restored within thirty days from the date of this order.