The DETROIT AND TOLEDO SHORE LINE RAILROAD COMPANY, a corporation, Plaintiff,

v.

UNITED TRANSPORTATION UNION, a Voluntary Unincorporated Association,

and

R. E. Ritchey, Individually and as General Chairman of Local Lodge No. 787 of the United Transportation Union (T), Defendants.

Civ. A. No. 6-70552.

United States District Court, E. D. Michigan, S. D.

April 23, 1976.

Charles R. Hrdlicka, Law Dept., The Detroit and Toledo Shore Line R. Co., Detroit, Mich., John M. Curphey, Robison, Curphey & O'Connell, Toledo, Ohio, for plaintiff.

C. Thomas Wilson, Detroit, Mich., for defendants.

## SUPPLEMENTAL MEMORANDUM OPINION

FEIKENS, District Judge.

Plaintiff, The Detroit and Toledo Shore Line Railroad Company (the Carrier), brings this action to enjoin defendant, United Transportation Union (the Organization), from carrying out a strike and work stoppage on plaintiff's railroad. An ex parte order temporarily restraining the threatened strike was granted by this court on March 16, 1976, but was vacated on March 24, 1976. Shortly thereafter the Organization went on strike. By agreement members of the Organization went back to work on April 6, 1976, pending further negotiations, but when the parties failed to settle the dispute the Organization again went on strike on April 8, 1976.

On April 15, 1976, on motion this court entered a preliminary injunction prohibiting the Organization from carrying out the strike. This opinion supplements and explains that order.

The present dispute between the parties first arose in 1967. In that year the Carrier began construction of a hump operation at the Lang Yard in Toledo, Ohio. This was the first hump operation on the Carrier's railroad. Switching at a hump yard, in contrast to flat switching, uses gravity rather than mechanical power to switch cars to their proper tracks; this necessitates the regulated retarding of the cars as they come over the hump. On July 2, 1967, the Organization served notice upon the Carrier pursuant to Section 6 of the Railway Labor Act (45 U.S.C. § 156) asking for certain changes in the existing collective bargaining agreement. In large part the notice sought the establishment of a car retarder operator position and of provisions regarding the hiring, training and pay of such operators. Implicitly, the Organization was asking that a fourth man, a car retarder operator, be added to the existing three man yard crew. On July 26, 1967, the Carrier served a Section 6 notice upon the Organization requesting in part the reduction of the yard crew from three men to two.

Throughout August, 1967, the parties negotiated with respect to the matters contained within the Section 6 notices. When they failed to reach agreement, the Organization invoked the services of the National Mediation Board under Section 5 of the Railway Labor Act (45 U.S.C. § 155). The Mediation Board took jurisdiction in November, 1967 (Case No. A–8238), but, un-

able finally to settle the dispute, it closed its file on April 9, 1968. Under the provisions of the Railway Labor Act, the Organization had the right to strike 30 days after the Mediation Board closed its file unless a state of emergency was found to exist. However, the Organization did not then go on strike.

After operations in the hump yard began in February, 1968, the Carrier assigned the requisite car retarder work to the yard foremen. The Organization initiated time-claim grievances on behalf of individual yard foremen called upon to perform car retarder operator work. These claims were submitted to Public Law Boards for binding arbitration pursuant to Section 3 (Second) of the Railway Labor Act (45 U.S.C. § 153, Second). In 1971–1972, Public Law Boards # 494 and # 820, in Awards 22 and 32 respectively, decided in favor of the Organization and awarded dual service pay to yard foremen who actually performed car retarder operator work. In 1973, Public Law Board # 820 in Award 47 denied a yardman's claim that the Carrier should have employed him to do the work of a car retarder operator rather than requiring the yard foreman to perform dual services. After Public Law Board # 494 decided Award 22 in January, 1971, the Carrier began paying an extra day's wages at car retarder operator rates to yard foremen who performed the car retarder operation. (Award 32 decided by Public Law Board # 820 in September, 1972, reaffirmed the decision in Award 22. Evidently the Carrier had hoped that Public Law Board # 820 would reverse the decision of Public Law Board # 494).[1]

In October, 1974, the Carrier installed electronic data processing equipment at the Lang Yard in order to automate the hump operation. Thereafter, the Carrier stopped paying the yard foremen dual service pay claiming that the need for car retarder operator work had been eliminated. In 1974–1975, the Organization filed numerous time-claim grievances. Some were filed on behalf of individual yard foremen who wanted dual service pay for performing car retarder operator work. These claims are analogous to those decided by Awards 22 and 32. Other claims were filed on behalf of yardmen who claimed that they should have been employed as car retarder operators instead of requiring the yard foremen to perform two functions. These claims are analogous to that decided by Award 47. None of these claims has been submitted to a Public Law Board pursuant to Section 3, (Second) of the Railway Labor Act (45 U.S.C. § 153, Second). All are still pending. In March, 1976, a member of the National Mediation Board was brought in at the request of the Organization to give informal assistance in order to settle the basic dispute. National Mediation Board Case No. A–8238 was not reactivated, however. No agreement was reached and on March 14, 1976, the Organization notified the Carrier that it intended to strike on March 17, 1976. The Carrier then brought this action to enjoin the strike.

Two classes of controversy are recognized in the Railway Labor Act. (45 U.S.C. § 151 et seq.)

[Major disputes relate] to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

[Minor disputes contemplate] the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.

---

1. Other awards were decided also, but they do not vary the basic facts relevant to this cause of action.

*Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886, 1894 (1945).

■ The Railway Labor Act specifies differing procedures for the settlement of major and minor disputes. Both require negotiation by the parties in an effort to reach a voluntary settlement. Minor disputes are subject to compulsory and binding arbitration by the National Railroad Adjustment Board at the election of either party. (45 U.S.C. § 153). If both parties agree, binding arbitration may be carried out by Public Law Boards instead. (45 U.S.C. § 153, Second). Neither party has the right to employ self-help, and if serious unilateral action is threatened by one party a Federal District Court may issue an injunction to preserve the primary and exclusive jurisdiction of the National Railroad Adjustment Board. *Brotherhood of Locomotive Engineers v. Louisville & Nashville Railroad Co.,* 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963).

■ The procedures for settling major disputes under the Railway Labor Act were concisely described by Mr. Justice Harlan:

A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10.

*Brotherhood of Railroad Trainmen, v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344, 354 (1969).

A Federal District Court may issue an injunction to preserve the status quo while these procedures are being exhausted by the parties.

There are three status quo provisions in the Act, each covering a different stage of the major dispute settlement procedures. Section 6, the section of immediate concern in this case, provides that "rates of pay, rules, or working conditions shall not be altered" during the period from the first notice of a proposed change in agreements up to and through any proceedings before the National Mediation Board. Section 5 First provides that for 30 days following the closing of Mediation Board proceedings "no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose," unless the parties agree to arbitration or a Presidential Emergency Board is created during the 30 days. Finally, § 10 provides that after the creation of an Emergency Board and for 30 days after the Board has made its report to the President, "no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose." These provisions must be read in conjunction with the implicit status quo requirement in the obligation imposed upon both parties by § 2 First, "to exert every reasonable effort" to settle disputes without interruption to interstate commerce.

*Detroit and Toledo Shore Line Railroad Co. v. United Transportation Union,* 396 U.S. 142, 150–51, 90 S.Ct. 294, 299, 24 L.Ed.2d 325, 333 (1969) (footnotes omitted).

If all procedures are exhausted without reaching a settlement, the parties may finally employ self-help.

Nowhere does the text of the Railway Labor Act specify what is to take place once these procedures have been exhausted without yielding resolution to the dispute. Implicit in the statutory scheme, however, is the ultimate right of the disputants to resort to self-help—"the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration." *Florida East Coast Railway Co. v. Brotherhood of Railroad Trainmen,* 336 F.2d 172, 181 (1964). *Brotherhood of Railroad Trainmen, v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344, 354 (1969).

The Organization contends that the dispute here is a major one. According to the Organization the Section 6 notices sent in 1967 defined the disagreement as major and constituted the first step in the exhaustion of the procedures for voluntary settlement as outlined in the Railway Labor Act. The Organization contends that 30 days after the National Mediation Board closed its file in 1968, it had the right to strike. It is the Organization's position that all procedures for voluntary settlement of the disputes defined in the 1967 Section 6 notices were exhausted by mid-1968, and the Organization has had the continuing right to strike since that time.

The Carrier agrees that the dispute as first defined in the 1967 Section 6 notices was a major dispute. However, the Carrier contends that the character of the major dispute was changed into that of a minor dispute after 1968 by the conduct of the parties. When the Organization failed to exercise its right to strike in 1968, but instead brought time-claim grievances under Section 3 of the Railway Labor Act, admittedly a procedure utilized only for the settlement of minor disputes, it abandoned the concept of a major dispute according to the Carrier. The Organization, having sought and accepted the benefits of the Section 3 procedure for settling minor disputes, may not now revive the abandoned major dispute, the Carrier maintains. The Carrier urges this court to grant an injunction under Section 3 to preserve the jurisdiction of the National Railroad Adjustment Board, which has, it contends, exclusive jurisdiction over this dispute.

The court holds that a major dispute is present. It does appear that the dispute has been treated as minor by both parties on occasion. The use of Public Law Boards to arbitrate time-claim grievances indicates this. Indeed, were the parties in disagreement only over the amount of money to be paid under the contract to a yardman doing car retarder operator work the dispute would be a minor one.

However, underlying the continuing minor dispute over money to be paid for services already allegedly performed is a major dispute, not controlled by the existing collective bargaining agreement. The Organization has intermittently insisted that the Carrier create a new job classification of car retarder operator and employ a fourth man in the yard crew to fill that classification. The Carrier has tried to change the existing collective bargaining agreement to permit a two man yard crew rather than the three man crew required under the agreement. (*See* Article 108, Agreement Between The Detroit and Toledo Shore Line Railroad Company And Its Trainmen and Yardmen.)

A dispute cannot be both major and minor; the terms are mutually exclusive under the Railway Labor Act. *United Transportation Union v. Burlington Northern, Inc.,* 458 F.2d 354 (8th Cir. 1972).

■ The United States Court of Appeals for the Sixth Circuit has held that "if the disputed action of one of the parties can 'arguably' be justified by the existing agreement or, in somewhat different statement, if the contention that the labor contract sanctions the disputed action is not 'obviously insubstantial', the controversy is within the exclusive province of the National Railroad Adjustment Board." [i. e. a minor dispute] *Local 1477 United Transportation Union v. Baker,* 482 F.2d 228, 230 (6th Cir. 1973). *See also United Transportation Union General Committee of Adjustment (On Property of Penn Central Co.) v.*

*Baker,* 499 F.2d 727 (7th Cir. 1974), *cert. denied,* 419 U.S. 839, 95 S.Ct. 69, 42 L.Ed.2d 66 (1974); *United Transportation Union v. Penn Central Transportation Co.,* 505 F.2d 542 (3rd Cir. 1974) and cases cited therein. Such is not the situation here. A minor dispute is created only where one party takes contested action that is arguably in conformity with the agreement or seeks relief to which it is arguably entitled by the terms of the agreement. Since the Organization does not here seek to establish a new car retarder operator position by reference to the collective bargaining agreement[2] and the Carrier cannot base its refusal to establish the new classification on an agreement which does not cover such matters, the dispute is not even arguably minor, and the National Railroad Adjustment Board has no jurisdiction over it.

■ The Organization asserts that it wants a change in the existing collective bargaining agreement to require a new car retarder operator classification. Either Carrier or Organization may request such a change of the agreement at any time, and any dispute growing out of such a request is clearly major in nature. The complaining party thus may be said to be master of its complaint. The Organization has requested a change in the agreement, and, by doing so, it has successfully defined a dispute growing out of the request as major in nature.

■ But although a major dispute is present the Organization is not now entitled to go on strike or to the right of self-help. In 1968, when the voluntary settlement procedures for settling the major disputes defined by the 1967 Section 6 notices were finally exhausted as required by the Railway Labor Act, the Organization could have gone on strike. Since then, however, circumstances were significantly altered by the computerization of the hump yard and the claimed total elimination of the car retarder operator function. This change in circumstances injects into the dispute a material element that was not considered in the proceedings before the National Mediation Board. The automation of the contested function would doubtless have a major bearing on the mediation process. The Organization may therefore no longer rely on the Section 6 procedures that were conducted in 1967–1968 as a predicate for a present right of self-help. Rather, a new Section 6 notice must be filed, and the voluntary settlement procedures for major disputes must again be exhausted. *Cf. Brotherhood of Railroad Trainmen v. Southern Railway Co.,* 393 F.2d 303, 309 (5th Cir. 1968) (implying that sufficiently altered circumstances require renewed Section 6 notice).

■ The court is supported in its view that a new Section 6 notice is now required by the evident purpose of the Railway Labor Act to delay resort to self-help and to promote voluntary settlement of major disputes. As Mr. Justice Black remarked, "A final and crucial aspect of the Act was the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process." *Detroit and Toledo Shore Line Railroad Co. v. United Transportation Union,* 396 U.S. 142, 149, 90 S.Ct. 294, 299, 24 L.Ed.2d 325, 332 (1969).

Accordingly, the court holds that a major dispute exists and it enjoins the strike until the voluntary settlement procedures required under the Railway Labor Act are finally exhausted.

---

2. It may be that the Organization does not now rely on the terms of the agreement for the establishment of a car retarder operator classification because Award 47 was decided against it. However, the denial in Award 47 does not prohibit the Organization from now trying to change the terms of the agreement.