In re MICHIGAN INTERSTATE RAILWAY COMPANY, INC., d/b/a Ann Arbor Railroad System, Debtor.

UNITED TRANSPORTATION UNION, Brotherhood Railway Carmen of the United States and Canada, and International Association of Machinists and Aerospace Workers, Plaintiffs,

v.

MICHIGAN INTERSTATE RAILWAY COMPANY, INC., Operator, Ann Arbor Railroad System, Defendant.

Bankruptcy No. 83–00054.
Adv. No. 83–0087.

United States Bankruptcy Court,
E.D. Michigan,
S.D. Flint.

Oct. 17, 1983.

Joseph Guerrieri, Jr., and John J. Sullivan, Highsaw & Mahoney, P.C., Washington, D.C., and Kathleen Buckley, Parker & Buckley, Flint, Mich., for plaintiffs.

Steven H. Keeney and Charles W. Chapman, Barnett & Alagia, Louisville, Ky., for defendant.

## MEMORANDUM OPINION AND ORDER

STANLEY B. BERNSTEIN, Bankruptcy Judge.

### I. *Procedural Background*

On January 20, 1983, Michigan Interstate Railway Company (Railway) filed a petition for a railroad reorganization under Ch. 11 of the Bankruptcy Code. As of the petition date, there were two pending suits previously filed in the U.S. District Court for the Eastern District of Michigan by various railway unions representing employees of the Railway. The first suit, No. 82–40421, was filed by the Brotherhood of Maintenance of Way Employees on October 25, 1982 for declaratory and injunctive relief. The District Court issued a temporary restraining order on October 25, 1982; a hearing on a requested preliminary injunction was held on November 4 and 5, 1982—a reserved decision is pending on that matter.[1]

The second suit, No. 82–40500, against the Railway was filed by the United Transportation Union (UTU) on December 6, 1982. The Brotherhood of Railway Carmen of the United States and Canada (Carmen) and the International Association of Machinists and Aerospace Workers (Machinists) intervened as joint plaintiffs in the UTU suit on December 30, 1982. The unions in the second suit also sought declaratory and injunctive relief. The joint plaintiffs in the second suit initially delayed moving for a preliminary injunction pending the District Court's decision in the first suit.

---

1. The Maintenance Union is not a party to the summary judgment motion. The automatic stay was lifted to allow the District Court to render a decision on that matter.

The UTU, Carmen, and Machinists then filed a complaint to lift the automatic stay, Adv.Proc. No. 83–0087, on March 9, 1983 so that they could prosecute the second suit before the District Court. At the preliminary hearing on this complaint, the Railway and the unions agreed to remove the second District Court suit to the Bankruptcy Court for more efficient administration of the reorganization proceeding. On June 13, 1983, the UTU, Carmen, and Machinists filed a motion for partial summary judgment; the motion was argued on August 11, 1983, and then submitted on briefs.

For ease of exposition, the dispute between the UTU and the Railway will be considered first; then the dispute between the Carmen and Machinists and the Railway will be considered. The issues are sufficiently different to warrant treating these matters separately.

II. *United Transportation Union Complaint*

A. *Legal Background*

The Railway Labor Act, 45 U.S.C. § 151 *et seq.,* is the controlling law for labor relations in the railroad industry. Because of the complexity of the disputes involved in this matter, the factual and legal issues are best analyzed after reviewing the history of the Railway Act. That history is summarized in *O'Donnell v. Wien Air Alaska, Inc.,* 551 F.2d 1141 (9th Cir.1977).

At the time of the Act's original passage in 1926, the railway industry had experienced extremely bitter and violent disturbances resulting from strikes, lockouts and other disruptive forms of self-help. The Act was a pioneering attempt to secure the peaceful settlement of these disputes and thus prevent the severely negative impact on the national economy resulting from interruptions in rail service. *Id.* at 1145.

As originally enacted, the statutory scheme defined the rights and duties of carriers and employees, including the employees' right to organize and bargain collectively. *Id.* Most importantly, it created procedures and federal administrative machinery to facilitate the selection of bargaining representatives and for reaching of agreements. Each step in the procedure [2] was subject to extended time limitations; first, to minimize the possibility of service interruptions and second, to create a cooling-off period to induce productive negotiations. The original Act was thus directed at disputes arising from the formation of agreements—what later became defined as "major disputes."

By 1934 it became obvious that the statutory scheme was ineffective to promote peaceful settlements of disputes over the terms and conditions of existing agreements—later defined as "minor disputes." The Act was amended in 1934 to include devices to resolve these "minor disputes" expeditiously.[3] *Id.* at 1146.

■ The Railway Labor Act as presently enacted contains several provisions applicable to the present proceedings. 45 U.S.C. § 151a sets out the general purposes of the act:

The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for te complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for prompt and orderly settlement of all disputes growing out of grievances or out of

---

**2.** The procedural requirements usually mandate conferences between management and labor and then proceed through arbitration and final award by the Mediation Board.

**3.** The procedures regulating minor disputes will be discussed *infra* in the section of this opinion concerning the Carmen and Machinists' action; the Transportation Union and the Railway agree that their dispute is properly categorized as a major one.

the interpretation or application of agreements covering rates of pay, rules, or working conditions.

The Act also imposes a number of duties upon employers and employees relevant to the present disputes. 45 U.S.C. § 152. Section 2, First, imposes upon carriers, their officers, agents, and employees the duty "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions." Similarly, Section 2, Seventh provides:

No carrier . . . shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in [45 U.S.C. § 156].

Section 6, 45 U.S.C. § 156, provides the exclusive remedy for major disputes:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

The federal courts, by necessary implication, are authorized to issue injunctions maintaining the status quo pending the exhaustion of section 6 procedures. *O'Don-*

*nell,* 551 F.2d at 1146; *Local 158 v. Toledo Lakefront Dock Co.,* 97 L.R.R.M. 2384, 2387 (N.D.Ohio 1977); *Detroit & Toledo R.R. Co. v. UTU,* 93 L.R.R.M. 2500, 2502 (E.D.Mich. 1976).

### B.  *Facts*

The United Transportation Union represents the train service employees employed by the Railway. The Union and the Railway have been parties to collective bargaining agreements since the Railway assumed operation of the Ann Arbor Railroad System in 1977.

This statutory framework provides the basis for determining the present dispute. The Railway sent the Transportation Union a Section 6 notice on March 14, 1980. The notice proposed eleven modifications of the existing contract, including reductions in the number of trainmen for each crew (crew consists) and the elimination of paid second meals for yard crews. Statutorily mandated conferences were held on the proposals throughout the summer and fall of 1980 and memorandums of agreement were signed on July 24, 1980 and November 7, 1980.

The Union served a Section 6 notice on the Railway on February 19, 1982; the Railway served the Transportation Union a section 6 notice on June 22, 1982. The parties agreed that the notices of February 19 and June 22 would be handled concurrently. Following negotiations, the parties entered into an agreement on June 26, 1982.[4] This agreement apparently resolved the issues previously raised because the parties signed a letter on June 29, 1982 by which they withdrew their respective Section 6 notices of February 19 and June 22.

The Railway operated the Ann Arbor Railroad System under a contract with the Michigan Department of Transportation. Sometime after the negotiations culminating in the June 26 agreement, the State of Michigan terminated the Railway as the operator of the northern two-thirds of the Ann Arbor System. In response to this

---

**4.** The text of this agreement is attached to this opinion as Appendix A.

drastic reduction in the Railway's operations, the General Chairman of the United Transportation Union sent the following letter to the Railway on October 1, 1982:

Mr. A.J. Hogg
Vice President of Operations &
General Manager
Ann Arbor Railroad System
Michigan Interstate Railway Company
P.O. Box 619
Owosso, MI 48867

Dear Sir:

The Agreement between the UTU and MIRC dated June 26, 1982, was contingent on MIRC operating the entire rail portion of the Ann Arbor Railroad System and to prevent its operation from being acquired by a non-union operator.

I have been advised the State of Michigan DOT has awarded a one (1) year contract to Michigan Northern and Tuscola, Sangamon Bay to operate that part of the Ann Arbor Railroad north of Ann Arbor, Michigan.

Therefore, the Agreement of June 26, 1982 is null and void. The provisions of our agreements prior to this agreement are again in full force and effect.

A train crew of one (1) conductor and two (2) brakemen should be re-established immediately. I would be agreeable to re-negotiate some of the provisions terminated such as specified switch locals if you elect.

Yours very truly,
J.J. Hults
General Chairman

The Railway responded with a letter on October 20, 1982:

Mr. J.J. Hults
General Chairman
United Transportation Union
Regency Center Building—Suite 16
13975 Manchester Road
St. Louis, Missouri 63011

Dear Mr. Hults:

Reference is made to your letter of October 1, 1982, advising that it is your position that the agreement dated June 26, 1982 and resolution of outstanding notices between the parties has been terminated.

The facts are as follows. On or about March 14, 1980, this carrier served Section 6 Notices on your organization. Item One of that Notice read as follows:

1. Established crew consist rules to allow two trainmen total on all crews. Also provide for one trainman for new special service trains (such as unit train moves).

Negotiations were held on that notice and by agreement dated November 7, 1980, we placed into effect an agreement for the prompt handling of cross-lake traffic. Our notice was not withdrawn, and remained open, and the agreement contained a written 15-day cancellation clause.

Subsequently, on or about January 1, 1981, your organization served more notices upon this carrier for changes in agreements, and the carrier served counter proposals. These were on a standby basis with national handling. Thereafter, your organization served additional counter proposals upon this carrier, which you stated were for local handling, or about February 19, 1982. On June 22, 1982, the Carrier served counter proposals for concurrent handling with those notices served by you on February 19, 1982.

Further negotiations were held with respect to our notices of 1982 at a meeting held on June 26, 1982 at Detroit, Michigan, as well as on Item One of our notice dated March 14, 1980. The result was the June 26, 1982 agreement. Under the terms of that agreement, this carrier agreed to withdraw our June 22, 1982 notice in light of the agreement, and we also agreed to a three-year moratorium on the serving of notices.

The June 26, 1982 agreement has no termination clause, however, your letter of October 1, 1982, advises, unilaterally that the agreement has been terminated. No further negotiations had been scheduled.

In light of the history of the overall matter, which includes your unilateral withdraw from a collective bargaining agreement entered into between the parties resolving such matters, and your letter of September 21, 1982 clearly indicating an

impasse and no further scheduled negotiations between the parties, Michigan Interstate, in accordance with the provisions of the Railway Labor Act, as amended, hereby advises that effective October 25, 1982, Item One of our notice of March 14, 1980, as well as Carrier's counter proposals to your February 19, 1982 Section 6 notices, copy attached, shall be placed in effect on the Ann Arbor Railroad System and shall supplement existing agreements to the extent provided therein.

Sincerely,

V.M. Malanaphy

Enclosures

The operative (and last) paragraph of the Railway's letter of October 20 states the Railway's construction of the legal effects of the UTU's letter of October 1, 1982 and subsequent behavior. The construction is framed in the special language spoken only by carriers and railway unions under the frame of reference of the Railway Labor Act. The key provision of the Act to this dispute, previously quoted in full, is Section 6, 45 U.S.C. § 156. This section requires a written *notice* of intended changes in rates of pay, rules and work conditions and a mandatory settlement conference; either party may then invoke the services of the National Mediation Board to settle any unresolved dispute. Under the Section 6 procedure, however, the National Mediation Board loses its jurisdiction unless a request is made (or the Board asserts jurisdiction on its own) within ten days of the termination of conferences or, as in this case, after the service of the notice when no conferences are held.

With this as background, the Railway's position, restated, appears to be that, in the alternative, (1) the October 1, 1982 letter served as a Section 6 notice—the Union demanded a change in working conditions, specifically on increase in the crew consist; the Union failed to arrange a settlement conference within thirty days as statutorily mandated, and failed to invoke the jurisdiction of the National Mediation Board within the ten day limit, or (2) the October 1, 1982 letter was the Union's assertion or admission that bargaining had reached an impasse and so the Railway was free to implement its intended changes under the Section 6 notices it had issued on March 14, 1980 and its counter-proposals on June 22, 1982 to the Union's Section 6 notice of February 19, 1982.

The Union, for its part, treated the Railway's October 20, 1982 letter as a Section 6 notice and invoked the jurisdiction of the National Mediation Board on October 27, 1982; the Board accepted the case on the same day.

No mediation sessions were held because of the Railway's contention that the time period had run by October 10, 1982—either because no conferences were scheduled timely under the Union's putative Section 6 notice of October 1, 1982 or that the October 1 letter commenced the ten day period as a notification of impasse.

The Union takes issue with the Railway's construction of the October 1 letter. The UTU maintains that its letter was merely declaratory in character; it simply announced the consequences of the Railway's loss of the northern two-thirds of its track and related operations. It did not admit any impasse in bargaining; indeed, it expressed a willingness to discuss at least some modifications in rules or conditions. And most certainly it did not follow the well-known form of a Section 6 notice.

The Union also takes issue with the Railway's contention that management's Section 6 notices of March 14, 1980 and June 22, 1982 were revived as a legal consequence of the Union's repudiation of the June 26, 1982 memorandum agreement. First the UTU claims it did not repudiate the June 26 agreement; the agreement terminated by its own terms and/or by the basic changes in the Railway's operating circumstances. Second, the Union claims that, assuming the June 26, 1982 agreement was repudiated, the Railway's prior Section 6 notices could not be deemed to have revived and have become self-enforcing.

Whatever the proper construction of the October 1 and October 20, 1982 letters,

there is no disagreement that the Railway imposed unilateral changes in rules and work conditions which continue in effect. Nor is there any disagreement that on October 25, 1982, UTU members were directed by Railway officers to sign a statement agreeing to work under the conditions of the Railway's October 20, 1982 letter. Those employees who refused to sign the statement were sent home without pay.

### C. Analysis

The determination of this dispute is made difficult by the "posturing" of both parties. Both parties exalt, if not subject to apotheosis, the form of Section 6 notices over the substance of collective bargaining under the Railway Labor Act.

The Union's "pronouncement" of October 1, 1982 is troublesome to this Court. To be sure, the June 26, 1982 agreement presupposed a substantial complement of employees—the introduction to the agreement indicates that the ultimate reason the UTU granted concessions to the Railway was to provide for job security:

> The United Transportation Union, in order to permit Michigan Interstate to effectively compete and operate the entire rail portion of the Ann Arbor Railroad System and to prevent its operation from being acquired by a non-union operator, hereby agrees to amend its present labor agreement with Michigan Interstate to provide for the following changes: [5]

As such, the severe reductions in the Railways operations [6] could be treated as kicking the props out from under the agreement. Although there is language in the agreement somewhat supportive of the Union's pronouncement, it was not, however, as unambiguously self-operating as the Union would have it. Nevertheless, the Union did not shut the door to the resumption of negotiations; its restriction of the agenda

was at best a bargaining position that any sophisticated negotiator could penetrate.

The Railway's October 20, 1982 letter was at best an overreaction borne of its frustration with its reduced operations. At worst, it was a manipulative and self-serving statement. There is no reasonable basis for the Railway's contention that its prior Section 6 notices were revived. That contention is absurd. The Section 6 notice of the March 14, 1980 led to an extended period of negotiations which resulted in a series of agreements, including those of July 24, 1980 and November 7, 1980. The June 22, 1982 notice was withdrawn in a letter, signed by the Railway, on June 29, 1982 as a result of the June 26 agreement. The June 26, 1982 agreement resolved the pending dispute in large part, and all prior Section 6 notices (if they retained any vitality at all) were "merged" into that agreement, for want of a better term. There surely was no reservation of the outstanding notices in the agreement. The only appropriate formal posture for the Railway to take was to issue a new Section 6 notice.

■ The Railway may have been in violation of the Act by not serving a Section 6 notice upon receipt of the State's withdrawal of the northern part of the train system from the Railway. In *United Industrial Workers v. Board of Trustees [Galveston Wharves]*, 351 F.2d 183 (5th Cir.1965), the carrier leased its facilities to a third party during the existence of a collective bargaining agreement and posted a notice of permanent layoffs. The Union sent the carrier a Section 6 notice, but management refused to open the contract in light of the conditions resulting from the lease. The Union struck and sought an injunction against consummation of the lease. The Fifth Circuit reversed the district court's denial of the injunction. The Court looked to the

---

**5.** The full text of this agreement is set forth as Appendix A to this opinion.

**6.** On or about October 1, 1982 the Michigan Department of Transportation terminated its contract with the defendant for the operation of the northern two-thirds of the Ann Arbor

Railroad System. The result was that the defendant's operations were reduced from over 300 miles to approximately 47 miles; union members employed were reduced from 384 to a mere 33.

moment of the layoffs and refusal to bargain and stated:

> Up to this moment a contract existed between Carrier and Union. Under that contract the elevator was to be operated by the Carrier, the work to be performed by members of this Union. In the language of § 2 Seventh (note 16, supra), this was the very essence of the arrangement "embodied in" the Agreement on "rates of pay, rules, or working conditions." Now all was being changed. But the Carrier can point to no provision of the contract giving it the contract right to make this decisive change. We may assume that an employer has the legal right to go out of business. But under the Railway Labor Act when he does so during the term of the agreement, it is such a change in "working conditions" that under § 6 and § 2 Seventh, he must give notice. By the simple language of § 2 Seventh, the procedure of § 6 ... was set in train. There is no pretense that § 6 was complied with. Under those circumstances the Union, and perhaps the National sovereign, became entitled to effective judicial relief to assure fulfillment of this national labor policy.

*Id.* at 189–90 (footnote and citations omitted). Although Michigan Interstate did not go out of business, the severe restriction of their contract by the State was sufficiently substantial to require notice; by their own admission, their operations were revised from over 300 miles to approximately 47 miles and from 384 union employees to 33 union employees.[7] As such, the necessarily resulting changes in working conditions reached a level to which Section 6 must apply. Even if it arguable that the *Galveston Wharves* doctrine is strictly limited to

situations in which there is a *complete* cessation of operations, the Railway's unilateral implementation of changes was improper; the appropriate step would have been to arrange a conference with the Union to discuss dealing with a much reduced operation.[8]

■ The statements which Railway official requested UTU members sign on October 25, 1982 were blatantly illegal. The statements covered subject matters expressly provided for under the collective bargaining agreement. The Supreme Court in *Order of Railroad Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788 (1943), applied the portion of the opinion regarding the relation of individual contracts to collective bargaining in the *J.I. Case Co.* decision to disputes under the Railway Labor Act. *Id.* at 347, 64 S.Ct. at 585. *J.I. Case Co. v. NLRB,* 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1943) held

> [A]n employee becomes entitled by virtue of the Labor Relations Act somewhat as a third party beneficiary to all benefits of the collective trade agreement... The individual hiring contract is subsidiary to the terms of the trade agreement and may not waive any of its benefits....

*Id.* at 336, 64 S.Ct. at 579. There is no arguable purpose to the statements prepared by the Railway to which they sought employee signatures other than acceptance of wages and working conditions less attractive than those contained in the bargaining agreement.

In light of these considerations, this Court finds that the Railway's imposition of unilateral changes violated the Railway Labor Act: the UTU's Motion for Partial

---

7. Affidavit of Vincent M. Malanaphy, President and Chairman of Michigan Interstate Railway Company (July 12, 1983).

8. Although the Court realizes that the debtor railroad's financial problems made it increasingly difficult to uphold its part of collective bargaining agreements, however, neither financial problems nor bankruptcy relieved the Railway of its contractual obligations. The Bankruptcy Code, 11 U.S.C. § 1167, expressly up-

holds the requirements of the Railway Labor Act:

§ 1167. Collective bargaining agreements. Notwithstanding section 365 of this title, neither the court nor the trustee may change the wages or working conditions of employees of the debtor established by a collective bargaining agreement that is subject to the Railway Labor Act (45 U.S.C. 151 et seq.) except in accordance with section 6 of such Act (45 U.S.C. 156).

Summary Judgment on the liability issue is *GRANTED*. The only remaining issue is damages.

### III. *Carmen and Machinists Complaint*

#### A. *Legal Background*

As previously discussed, the Railway Labor Act was amended in 1934 to provide procedures to resolve disputes arising from the interpretation of collective bargaining agreement, defined as minor disputes. These procedures are very different from those used in major disputes, and should be carefully distinguished. In a major dispute, the party seeking changes must serve a Section 6 notice and arrange for a settlement conference. If the dispute remains unresolved, either party may request the services of the National Mediation Board. Section 6 requires that the parties maintain the status quo throughout the procedures; unilateral changes may only be implemented after an impasse is reached and the Board's services are not requested or after the mediation process fails.

The procedures for minor disputes is significantly different. When private negotiations fail to resolve labor difficulties, either party may compel arbitration by the National Labor Adjustment Board. 45 U.S.C. § 153.[9] The Adjustment Board's awards are contained in an order, for which the prevailing party may seek enforcement in a federal district court.

■ Unlike the major dispute process, the minor dispute procedures do not require maintaining the status quo. This does not mean, however, that the parties are free to impose unilateral changes from which the opposing party has no recourse during the arbitration proceedings. Although the Adjustment Board has exclusive jurisdiction to decide the merits of the dispute, the district court retains jurisdiction to grant a preliminary injunction to maintain the status quo pending the outcome of a determination by the Board. *See Brotherhood of Locomotive Engineers v. Missouri, K. & T.R. Co.*, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1435 (1960); *Local Lodge 2144 v. Railway Express Agency, Inc.*, 409 F.2d 312 (2d Cir. 1969); *Westchester Lodge 2186 v. Railway Express Agency, Inc.*, 329 F.2d 748 (2d Cir. 1964). The court in *Westchester Lodge 2186* explained:

> Though the Railway Labor Act imposes no explicit duty on an employer to restore the *status quo ante* during the pendency of a minor dispute, the federal courts have broad equitable powers to issue injunctions and other appropriate orders to effectuate the policies and purposes of the Act.

329 F.2d at 752. The Second Circuit then stated that the determination of whether a preliminary injunction should issue rests upon balancing competing claims of irreparable hardship. *Id.* at 753. Thus the maintenance of the status quo is required by Section 6 in major disputes and may be court ordered in minor disputes.[10]

The most troublesome problem for courts hearing cases under the Act is determining whether a dispute is a major or a minor one. The difference between the two is critical because the status quo requirement

---

**9.** Alternatively, the parties may stipulate to binding arbitration pursuant to 45 U.S.C. § 157.

**10.** The requirement in major disputes of maintaining the status quo is central to the design of the RLA. As the Supreme Court described in *Detroit & Toledo Shoreline Railroad Co. v. United Transportation Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), although the requirement's immediate effect is to prevent strikes and management action which would justify a strike, the long range purpose is to allow a period of cooling off to facilitate an atmosphere conducive to meaningful and rational bargaining. *Id.* at 150, 90 S.Ct. at 299.

The conditions which must be maintained are "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Id.* at 153, 90 S.Ct. at 301. Although the issuance of an injunction in minor disputes is subject to the equitable rules regarding injunctions, the status quo ordered should be the same as that required by section 6, since the underlying policies are the same— to promote resolution of the dispute and to prevent strikes. *Westchester Lodge 2186 v. Railway Express Agency, Inc.*, 329 F.2d 748, 752–53 (2d Cir.1964).

only attaches automatically to major disputes. The landmark decision distinguishing the difference between major and minor disputes is *Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1944). In *Elgin,* Justice Rutledge stated in the majority opinion that the difference primarily rests upon whether the dispute arises from the formation of collective bargaining agreements or are rather in the nature of a grievance on an interpretation of an existing agreement:

The difference between disputes over grievances and disputes concerning the making of collective agreements is traditional in railway labor affairs. It has assumed large importance in the Railway Labor Act of 1934, substantively and procedurally. It divides the jurisdiction and functions of the Adjustment Board from those of the Mediation Board, giving them their distinct characters. It also affects the parts to be played by the collective agent and the represented employees, first in negotiations for settlement in conference and later in the quite different procedures which the Act creates for disposing of the two types of dispute. Cf. §§ 3, 4.

The statute first marks the distinction in § 2, which states as among the Act's five general purposes: "(4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." The two sorts of dispute are sharply distinguished, though there are points of common treatment. Nevertheless, it is clear from the Act itself, from the history of railway labor disputes and from the legislative history of the various statutes which have dealt with them, that Congress has drawn major lines of difference between the two classes of controversy.

The first relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

In general the difference is between what are regarded traditionally as the major and the minor disputes of the railway labor world. The former present the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid. Because they more often involve those consequences and because they seek to create rather than to enforce contractual rights, they have been left for settlement entirely to the processes of noncompulsory adjustment.

The so-called minor disputes, on the other hand, involving grievances, affect the smaller differences which inevitably appear in the carrying out of major agreements and policies or arise incidentally in the course of an employment. They represent specific maladjustments of a detailed or individual quality. They seldom produce strikes, though in exaggerated instances they may do so. Because of their comparatively minor character and the general improbability of their causing interruption of peaceful relations and of traffic, the 1934 Act sets

them apart from the major disputes and provides for very different treatment. *Id.* at 722–24, 65 S.Ct. at 1289–91 (footnotes omitted). The court then described the very different procedures involved in the treatment of major and minor disputes, previously discussed in this opinion.

The difference in principle between the types of disputes is easily understood, but the application of that difference is more difficult. The Sixth Circuit has established the following test:

> [T]he courts of appeals have consistently ruled that if the disputed action of one of the parties can "arguably" be justified by the existing agreement or, in somewhat different statement, if the contention that the labor contract sanctions [sic] the disputed action is not "obviously insubstantial", the controversy is within the exclusive province of the National Railroad Adjustment Board [i.e., a minor dispute].

*Local 1477 United Transportation Union v. Baker,* 482 F.2d 228, 230 (6th Cir.1973).

### B. *The Facts*

The Carmen and the Machinists, like the UTU, have been parties to collective bargaining agreements with the defendant Railway since 1977; their most recent agreement was entered into on June 22, 1981.[11] A section of that agreement, paragraph E 1(c), is the basis of the present dispute:

> This Agreement shall be null and void if the Michigan Department of Transportation either abandons or replaces MI as the operator of the Ann Arbor Railroad System as defined in the Operating Agreement for Rail Service Continuation Contract Number 77–1510 of the Michigan Department of Transportation with the exception of the line segment from Owosso to Swan Creek, commonly referred to as the Saginaw Branch, or any parts thereof.

11. The full text of the June 22, 1981 agreement is set forth in Appendix B to this opinion.

The Railway was replaced by the Michigan Department of Transportation for the portion of the Ann Arbor Railroad System from Ann Arbor to Frankfort on October 1, 1982, however, the defendant continues to operate the system from Toledo, Ohio to Ann Arbor, Michigan.

The Carmen received a letter, dated October 1, 1982, from the Railway which quoted the above provision and the stated:

> This is to advise that the agreement [of June 22, 1981] is null and void, and the rates of pay and working conditions for employees shall be those in effect prior to any changes therein as may have been made effective by National Agreements reached in 1981 or 1982.

The Railway immediately imposed October, 1980 wages and working conditions upon employees represented by the Carmen and Machinists. Those wages and working conditions presently remain in effect. The Unions contend that such action constituted a major dispute, thus requiring the maintenance of the status quo during the pendency of Section 6 procedures. The Railway contends that the dispute is a minor one to which the status quo requirement does not attach absent the commencement of proceedings in the Adjustment Board and a court injunction following a showing of irreparable harm by the unions.

### C. *Analysis*

The Sixth Circuit's "obviously insubstantial" test assists in the application of the *Elgin* rule. Judge Newblatt in *Marine Engineers v. Straits Car Ferry,* 113 L.R.R.M. 2109 (E.D.Mich.1982) has refined the Sixth Circuit's test and made it more practical. In that case, the parties to a collective bargaining agreement disagreed over whether a dispute under the Railway Labor Act was a major or minor one. If minor, the district court had no jurisdiction; the jurisdiction of minor disputes is exclusively in the Railroad Adjustment Board.[12]

12. Although the district court may enter an injunction in a minor dispute, that action can only be taken after proceedings are commenced before the Board; no Board action was

The contract provision in dispute, the last paragraph of "Rule 2" of the agreement, stated that if "the parties disagree over the application of the economic provisions of the so called 'various' Agreement then, in the event, upon thirty days notice to the other, each party may resort to economic action...." 113 L.R.R.M. at 2110. The first part of the paragraph stated that the "economic adjustments" to be negotiated in the "various Great Lakes steamship companies" Agreement should be applied to the economic provision of this agreement on its anniversary dates. *Id.*

In developing his approach, Judge Newblatt noted that a minor dispute had to be at least not "obviously insubstantial" under the Sixth Circuit's test in *Local 1477, United Transportation Union v. Baker.* What is a minor or major dispute turns on a term of art under the Railway Labor Act. As such, the court ultimately has to find out *what* precisely the parties are disputing about, and secondly, the court must locate the *source* of that dispute. *Id.* at 2111.

The Court rejected the contention that the parties were disputing whether the status quo must be maintained—not only did the parties agree that they could not bargain away the mandatory provisions of the Act, but "the status quo requirement is central to [the Act's] design." *Id. (quoting Detroit & Toledo Shore Line R.R. Co. v. United Transportation Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969)). The Court thus found the dispute really was whether the defendant carrier must pay the economic adjustments negotiated in the "various" Agreements while they attempted to resolve the dispute; the source of the dispute was therefore the interpretation of Rule 2—a minor dispute. *Id.*

Applying the rationale of *Marine Engineers* to the present dispute, it appears that the parties are in dispute over two distinct, although related, issues. First, the parties disagree whether the June 22, 1981 agreement remains in effect at all, or whether the state's reduction of the defendant's operations nullified the agreement by its own terms as found in paragraph E 1(c). The second issue arises if the June 22 agreement is in fact void, that issue being what terms and conditions of employment are properly in effect. Thus not only is the dispute not "obviously insubstantial," but it goes to the heart of the minor/major dispute distinction, and that is whether a collective bargaining agreement exists at all.

The source of the dispute superficially appears to be paragraph E 1(c) of the agreement. Closer review reveals that the construction of the agreement is not, in fact, any source of contention. Neither party has alleged that the agreement would not have been rendered null and void if the state had replaced the defendant as operator of the Ann Arbor system except for the "Saginaw Branch." The State's Department of Transportation did not fulfill that condition precedent; the defendant retained operation of one-third of the Ann Arbor Railroad System irrespective of the "Saginaw Branch." The source of the dispute was thus necessarily the result of defendant's unilateral rejection of the agreement and implementation of 1980 wages and working conditions.

## IV. *Conclusion*

All of the parties to these disputes have obviously been involved in an emotionally-charged, long term problem. The Railway's financial situation deteriorated rapidly. The unions reacted by attempting to maintain the best wages and working conditions possible while providing job security for their members. The Railway attempted to cut its economic losses sufficiently to allow its survival. The reduction of the Railway's operations by the state on October 1, 1982 appears to have triggered near panic all around. The UTU responded by sending its letter purporting to nullify its contract with the defendant; the Railway sent its letter to the unions rejecting that agreement the

pending in *Marine Engineers* at the time the union sought a preliminary injunction from the district court.

same day. The Railway went much further by imposing unilateral changes.

This tense situation exemplifies why the extensive procedures required by the Railway Labor Act are necessary. Because this Court finds that the unilateral changes imposed by the defendant Railway were in violation of the Act, the plaintiff Unions' motion for partial summary judgment is GRANTED.

SO ORDERED.

## APPENDIX A

### AGREEMENT BETWEEN THE UNITED TRANSPORTATION UNION AND MICHIGAN INTERSTATE RAILWAY COMPANY, (OPERATOR) ANN ARBOR RAILROAD SYSTEM

The United Transportation Union, in order to permit Michigan Interstate to effectively compete and operate the entire rail portion of the Ann Arbor Railroad System and to prevent its operation from being acquired by a non-union operator, hereby agrees to amend its present labor agreement with Michigan Interstate to provide for the following changes:

(1) Until the United Transportation Union (UTU) receives determination of the injunctive relief being sought on the termination of those employees on a leave of absence from Conrail, Michigan Interstate Railway Company (MI) will honor their seniority on the Ann Arbor.

(2) Effective immediately, the size of a train crew is reduced to a manning consist of one conductor and one brakeman.

(3) Carrier will have the right to establish "specified switch locals" at yard rate of pay and basis. These locals may perform both road and yard work without penalty.

(4) Train crews will not be paid arbitrary allowances for such items as air tie, initial and final terminal delay. This provision does not apply to special allowances such as meals nor penalty payments or fringe benefits such as vacation pay and health and welfare payments.

(5) Train crews will be responsible for the signing of Shipper's Bills of Lading.

(6) All guarantees are eliminated to the extent that they can provide for no more than a minimum of 40 straight time hours per week.

DATED: June 26, 1982   By: /s/ J. J. Hults
United Transportation Union

By: /s/ Vincent M. Malanaphy
Michigan Interstate Railway Co.

## APPENDIX B

### AGREEMENT BETWEEN MICHIGAN INTERSTATE RAILWAY COMPANY AND CERTAIN LABOR ORGANIZATIONS FOR LABOR CONTRIBUTIONS TO SELF SUFFICIENCY FOR THE ANN ARBOR RAILROAD SYSTEM

Whereas in light of the Federal Government's curtailment in providing funds to the State of Michigan for operating subsidies for the continuation of service on Light Density Lines and in recognition of the financial condition of the State of Michigan which has required the implementation of a rail rationalization plan to reduce subsidy requirements, the Agreement is intended to provide:

A) That in the event that Michigan Interstate Railway Company (MI) becomes the operator of other lines in the State, such lines will be operated with union labor.

B) For the deferral of certain wage increases, without reductions in current rates of pay, from agreement employees as a means of enhancing the Ann Arbor Railroad System's (AA) prospects of becoming self sustaining. To accomplish this objective, MI agrees to adopt and apply the terms of the National Agreements reached between the industry and signatory organizations, subject to the limitations hereinafter set forth.

C) In recognition of the employees' sacrifices in participating in the wage deferral agreement, a Variable Earnings Program will be implemented to afford the

employees the opportunity to participate in all profits of the Company, on an after-tax basis, in excess of its base profit objective.

D) A non-contributory Employee Stock Ownership Plan in order to provide ownership in the Company to the employees and encourage increased productivity.

A) *Assumption of Other Operations*

Should MI assume operations of any other lines in the State of Michigan, it is agreed that:

1)(a) These lines will be operated as if they were part of the Ann Arbor Railroad System and subject to the rates of pay, including cost of living adjustments (hereinafter collectively referred to as "rates of pay") and, as hereinafter provided, said employees of such lines will be subject to Ann Arbor labor agreements in effect.

(b) Implementing agreements will be negotiated prior to the assumption of operations permitting the deployment of existing Ann Arbor personnel wherever possible and the establishment of work rules, no more costly overall, than the previous operator's method of operation with no crossing of craft lines.

B) *Wage Deferral Program*

1)(a)(i) Increases in rates of pay, provided for in the National Agreement to be made effective on or before December 31, 1981, shall be made effective for each craft or class of AA employees on the respective dates set forth in the National Agreement to the extent the sum of such increases exceeds 10%.

(ii) Increases in rates of pay provided for in the National Agreement in 1981 and future National Agreements during the life of this Agreement, will be made effective for each craft or class of AA employees on the respective dates set forth in the National Agreements to the extent the sum of such increases, combined with the sum of the increases in rates of pay provided for and referred to in subparagraph (i), exceeds 12%.

(iii) For the purposes of this Agreement, each "increase", including each cost of living adjustment, shall be computed as a percentage increase over the rate of pay existing immediately prior to the increase.

(b) This document shall not be construed to require a reduction in rates of pay in effect as of the date of this Agreement.

2) The Company reserves the right not to place into effect the terms and conditions of the National Agreement for AA employees in any craft or class the representatives of which are not signatories to this Agreement.

3) Labor cost savings resulting from (a) the National Agreement as applied to a craft or class of AA employees, or (b) implementation of the existing Crew Consist Agreements or the Fireman Manning Agreement, or (c) any action by the Company authorized by Title V of the Regional Rail Reorganization Act of 1973, as amended, (the "Rail Act"), or, (d) separation of employees under any other law or agreement, or (e) termination or transfer of AA responsibility to act as the State's agent for the actual payment of allowances, expenses or costs under Title V of the Rail Act, or other employee protection program, shall not be counted toward the amount of labor contributions or labor cost savings required under this Agreement.

4) If this Agreement should be determined to be invalid in whole or in part with respect to any craft or class covered, this Agreement shall be of no force or effect with respect to that craft or class and the rates of pay of all employees in such craft or class shall be returned to the levels applicable on the effective date of this Agreement.

5)(i) Non-Agreement Personnel. Employees who are not subject to collective-bargaining agreements (hereinafter in this section referred to as "non-agreement personnel") are foregoing wage increases and/or benefits in an amount proportionately equivalent to the amount foregoing by agreement employees. The amount foregoing by non-agreement personnel will

be treated as a total of the total payroll of the non-agreement personnel payroll so as to preserve the provisions of the Company's Performance Appraisal and Wage and Salary Administration Policies and Procedures.

(ii) For purposes of this subparagraph, non-agreement personnel shall be assumed to be eligible to receive periodic wage increases to the same extent as agreement employees based on weighted composite average of all crafts on an annual basis.

C) *Variable Earnings Program*

1)(i) All employees of Michigan Interstate Railway Company both agreement and non-agreement personnel, subject to the provisions of Section B), The Wage Deferral Program, shall automatically qualify for participation in the Variable Earnings Program which will enable the employees to share in a portion of the profits above the Company's basic profit objective on an after-tax basis.

(ii) The Company's basic profit objective is $1,500,000 on an after-tax basis utilizing a straight line method of depreciation for the calculation of the amount of funds to be placed in the employees variable earnings fund for each fiscal year ending March 31.

(iii) The books of the Company will be closed within thirty (30) calendar days after the end of the fiscal year. Within forty-five (45) days after the closing of the books, the Company's outside Certified Public Accountants will calculate the employees variable earnings fund and the results will be furnished to labor organizations signatory to the Agreement. If no exception is taken to the accountants' report within fifteen (15) days, the fund will be distributed to the employees.

2) The funds will be prorated to the employees in direct proportion to the hourly rate of pay deferred for each hour actually worked by each "active employee" during that fiscal year. An "active employee" is an employee who was on the active payroll of the Ann Arbor Railroad System in any given calendar month and has not left the employment of the Company for any reason other than retirement, medical leave or disability.

3) The disbursement of funds to the variable earnings program will be determined in accordance with the following schedule:

| Profits After Taxes | % to Fund | $ at Maximum Level | Cumulative |
|---|---|---|---|
| $1,500,001 to $2,500,000 | 100% | $1,000,000 | $1,000,000 |
| $2,400,001 to $3,500,000 | 75% | $ 750,000 | $1,750,000 |
| $3,500,001 to $4,500,000 | 50% | $ 500,000 | $2,250,000 |
| $4,500,001 and over | 25% | (unlimited) | (unlimited) |

D) *Employee Stock Ownership Plan* (hereinafter ESOP)

1)(a)(i) Active employees of Michigan Interstate Railway Company shall be entitled to participate in the opportunity to acquire capital stock of Michigan Interstate Railway Company.

(ii) Active employees are those pursuant to the definition contained in paragraph 2, Section C) on the payroll on or after April 1, 1981.

(iii) Any employee subject to this Agreement may elect not to participate in the ESOP without any consequence to any other provision of this Agreement. However, if the number of employees electing not to participate in ESOP exceeds 25% of the active employees of record, the plan will not become effective.

2) A detailed "Summary Plan Description" outlining the provisions of the plan, shall be made available as soon as possible after approval of the Internal Revenue Service that the plan is a "defined contribution" plan qualified under Section 401(a) of the Internal Revenue Code.

3) The ESOP will be leveraged and a Trust shall be established to administer the ESOP, in accordance with the terms of the ESOP and applicable laws and regulations.

4) Michigan Interstate Railway Company will split the present 1,200 shares on a hundred to one split and make 40,000 shares available for purchase by the Trust. The Trust would finance the purchase of stock through a loan and the loan would be retired through the Company's monthly contribution to the Trust. The purchase price of the stock is to be determined by an outside appraiser on a market value basis.

5) The Trust shall be established to administer the ESOP in accordance with the terms of the ESOP and applicable laws and regulations.

6)(a)(i) The Plan will be implemented as follows:

Concurrent with the effective date of the wage deferral program and until the Trust is retired, the Company will contribute the deferred amount of pay for "active employees" pursuant to the definition contained in paragraph 2, Section C), into the Trust on a monthly basis.

(ii) Each "active employee" will be credited with the applicable equivalent hourly deferred rate for each hour actually worked toward the purchase of stock in the employee's name under the conditions set forth in the Trust.

7) The provisions of the ESOP program is subject to the approval of a majority of the Stockholders of MI, the agreement of the Stockholders to sell their stock to the ESOP, and, also subject to the renewal of the contract of MI for the continued operation of the present system.

E) *Terms Conditions of Agreement*

1)(a) This Agreement shall be construed as a separate Agreement by and on behalf of Michigan Interstate Railway Company, its employees represented by the labor organizations signatory hereto, each such signatory.

(b) This Agreement is made subject to the ratification procedures of the respective labor organizations signatory hereto. Such organizations agree to notify MI promptly of the results of such ratification.

(c) This Agreement shall be null and void if the Michigan Department of Transportation either abandons or replaces MI as the operator of the Ann Arbor Railroad System as defined in the Operating Agreement for Rail Service Continuation Contract Number 77–1510 of the Michigan Department of Transportation with the exception of the line segment from Owosso to Swan Creek, commonly referred to as the Saginaw Branch, or any parts thereof.

2) This Agreement shall be in effect for a five year (5) period and shall expire on March 31, 1986. Upon the expiration of the Agreement, the signatory parties shall review and then evaluate the merits of continuation of the provisions of the Agreement for an additional five-year period.

3) All signatory parties to this Agreement shall endeavor to secure the necessary rehabilitation funds to restore the physical plant to a condition in compliance to FRA standards suitable for the operation of trains at a maximum speed of forty (40) miles per hour.

[Signature page omitted]